**Mary KRIEGER, Plaintiff–Appellee,**

v.

**GOLD BOND BUILDING PRODUCTS, A Division of National Gypsum Company, Defendant–Appellant.**

**No. 13, Docket 87–7962.**

United States Court of Appeals, Second Circuit.

Argued Sept. 7, 1988.

Decided Dec. 19, 1988.

David Rothenberg, Rochester, N.Y. (Geiger & Rothenberg, Rochester, N.Y., on the brief), for plaintiff–appellee.

Edward Katze, Atlanta, Ga. (Constangy, Brooks & Smith, Atlanta, Ga., Anne S. Simet, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., on the brief), for defendant-appellant.

Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and POLLACK, District Judge.*

KEARSE, Circuit Judge:

Defendant Gold Bond Building Products, a division of National Gypsum Company ("Gold Bond" or the "company"), appeals from a final judgment entered in the United States District Court for the Western District of New York, following a bench trial before Michael A. Telesca, *Judge*, awarding plaintiff Mary Krieger, *inter alia*, (1) reinstatement to a job as sales representative of Gold Bond with no loss of seniority or privileges, (2) backpay of $60,-843.38, plus interest, and (3) attorney's fees of $51,269, on the ground that in terminating Krieger's employment, Gold Bond discriminated against Krieger because of her gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1982). On appeal, Gold Bond contends principally that the district court failed to explain adequately its rejection of Gold Bond's evidence, relied on inadmissible evidence, made certain findings that were clearly erroneous, and included improper enhancement in its award of attorney's fees. For the reasons below, we conclude that the enhancement of attorney's fees was unwarranted, and in all other respects we affirm the judgment.

## I. BACKGROUND

The findings of the trial court set forth in its Decision and Order dated October 6, 1987 ("Decision"), together with the evidence supporting the findings, revealed the following.

Krieger was a full-fledged sales representative for Gold Bond from November 1975 until she was fired in April 1981. She was first employed by Gold Bond in 1971 as a stenographer; she was promoted to the position of "assistant sales serviceman" in 1973. In July 1975, Krieger learned that a full-fledged salesperson position was available but encountered difficulty in even being considered for the position. When she asked the regional manager to allow her to interview for the position, his initial reaction was simply to tell Krieger to "get out" of his office. Krieger persevered, however, and eventually was interviewed for the job. The job was at first awarded to another candidate, but illness prevented him from performing his new duties. After the position remained vacant for a few months, Krieger sought it again. This time she was given the job, and she began to work as the salesperson for the Buffalo southern tier territory in November 1975. She was the only woman salesperson then employed by Gold Bond in its Buffalo district.

---

* Honorable Milton Pollack, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

The duties of a Gold Bond salesperson included selling the company's products in the assigned territory, servicing the territory's customers with respect to those products, and seeking out new customers. The salesperson was required to file weekly activity and expense reports with the company. Each salesperson was given a sales objective to meet, and the company viewed the achievement of sales equaling or exceeding the assigned quota as the salesperson's single most important responsibility.

Krieger's performance as a salesperson generally earned her praise from the company, as in virtually every year her sales either exceeded her quotas or exceeded the performance of many of her male counterparts in the surrounding areas. In 1976, she sold 111% of her quota. In 1977, she sold more than 133% of her quota. In 1978, though she achieved only 95% of her quota, that quota had been increased by 43% over its 1977 level, and in fact her sales were $10,000 higher in 1978 than in 1977. Thus, Harley Logsdon, the then-new district manager for the Buffalo district, rated her performance as "acceptable," and then-regional manager Al Burgess congratulated her for achieving "quota buster" status with her 1978 sales. For 1979, Krieger's sales performance was rated even better—"very acceptable"—and she was described in her overall evaluation as "competent."

In 1979, the local economy declined and Krieger's territory was closed. In December she was transferred to the rural, unstaffed Finger Lakes territory, which, like her old territory, consisted principally of small building products dealers. Despite her request in March 1980 to be reassigned to a vacancy in a more active area, Krieger remained assigned to the Finger Lakes territory until her employment was terminated in April 1981.

In the new area, Krieger sold only 87% of her quota for 1980. Nonetheless, she outperformed half of her male counterparts in the surrounding areas who, for 1980, averaged less than 80% of their quotas.

In January 1981, part of Krieger's territory was reassigned to another salesperson. Krieger's quota, however, was increased by 13%. Notwithstanding the decrease in territory and the increase in quota, Krieger's sales of more than $216,000 for the first four months of 1981 exceeded her new quota for that time period.

On three occasions after Logsdon became assistant district manager and then district manager for the Buffalo area in 1978, Krieger received criticisms for matters other than the level of her sales. In the spring of 1978, Logsdon sent her a memorandum stating that she had taken excessive sick leave and had failed to file timely reports, and criticizing her dress and overall appearance. The memorandum warned that if the deficiencies were not cured, Krieger would be placed on probation. After Krieger discussed this report with Logsdon and showed him medical records, he told her that probation was not warranted; nonetheless, in July of that year she was placed on 30 days' probation. In May 1980, Logsdon placed Krieger on 60 days' probation, citing delays in her paperwork. Ultimately, for the year 1980 Logsdon gave her a performance rating of "marginal." Finally, on January 30, 1981, citing Krieger's failure to sell the full range of Gold Bond's products and her use of her home telephone instead of personal visits to contact her clients, Logsdon placed her on 90 days' probation.

During this last probationary period, Krieger repeatedly asked Logsdon to advise her how she was progressing. He merely encouraged her to " 'keep doing what you're doing.' " Decision at 9. Krieger's performance during these first few months of 1981 was indeed considered good by the company. She sold over 100% of quota during this period and was recognized in a company publication as a salesperson who had "beat the average." On April 29, 1981, however, Logsdon summoned Krieger to his office and summarily announced, " 'You are no longer employed with Gold Bond.' " Decision at 11. When Krieger asked for an explanation, Logsdon said, " 'It just doesn't matter, you don't work for Gold Bond.' " *Id.* He told her

that if she did not resign, she would not be paid backpay or severance pay. When Krieger declined to resign, Logsdon fired her.

The trial court found that Gold Bond fired Krieger because she was a woman.

Gold Bond, presenting its position at trial principally through the testimony of Logsdon, contended that in fact it had fired Krieger because of her poor paperwork, her failure to sell the full range of the company's products, and her use of her home telephone to contact customers. The trial court found that the company had created a genuine issue of fact as to its claimed reasons; but it found Logsdon not to be a credible witness, and it rejected each of the company's proffered reasons as mere pretexts.

It noted that the company's sales manual stated, and Logsdon had admitted at trial, that "[s]elling the assigned quota for the territory [was] the number-one priority" given to the Gold Bond salespersons, Decision at 19, and that the overwhelming weight of the evidence showed that Krieger's performance in this respect was good throughout her employment as a salesperson. The court found that her failure to sell the full range of the company's products could not have been a genuine reason for her termination because, given the local economy, "across the board sales were nearly impossible to make in the territories to which the plaintiff was assigned." *Id.* at 20. One salesman previously assigned to the Finger Lakes area testified that he too had been unable to sell the full range of products in that area and had moved on because of the territory's lack of potential (" '[he] was starving to death.' "). *Id.* He was never placed on probation or otherwise disciplined for his failure to sell the company's full line of products; rather, he was hailed by Logsdon as a " 'super star' " and received substantial recognition from the company for his sales performance. *Id.*

Similarly, the court found that Gold Bond's reliance on Krieger's tardy filing of the weekly reports was "nothing more than pretext for gender-based discrimination." *Id.* at 21. The court noted that Krieger had repeatedly made written requests for help in preparing these reports; she never received so much as a response to her requests for help. Further, though Krieger was often late in filing her reports, so were many other company salespersons. The court noted that Krieger's paperwork was no worse and no more tardy than that of many of the men. Yet for their tardiness the men were neither fired nor even placed on probation. Indeed, the company did not even have a procedure for placing an employee on probation. As additional evidence of Logsdon's use of a double standard where Krieger was concerned, the court noted that at the same time Logsdon was criticizing Krieger for her paperwork, he was demanding that she submit to the company false expense vouchers and pay him the unspent amounts for which she obtained reimbursement.

Finally, the court also rejected the company's suggestion that Krieger was terminated because of her use of her home telephone to contact customers. First, the Finger Lakes area covered nine counties in which Krieger had 168 customers; it would have been "nearly, if not entirely, impossible for one sales representative to make personal calls upon every account within that extensive territory," *id.* at 22. Further, on one customer visit on which Krieger was accompanied by Logsdon, the two had been kept waiting nearly an hour, and Logsdon had advised Krieger to use the telephone more. In addition, in March 1980, Logsdon had cut Krieger's expense allowance, specifically reducing her mileage allowance. The court also noted that the company did not provide salespersons with offices or telephones, and they normally worked out of their homes. Thus, other Gold Bond salespersons testified to their extensive use of their telephones to contact customers; none of them was fired for this.

In all, the court concluded that Krieger had "adequately demonstrated that the reasons set forth by the defendant to explain her termination are nothing more than pretexts to mask its discrimination-based firing of her." *Id.* at 19.

The court also considered evidence that Gold Bond, in addition to discriminating against Krieger personally, had engaged in a pattern and practice of discriminating against women sales personnel. It found that nationwide only 2.7% of Gold Bond's sales force were women, a figure well below the percentage of women in the work force available and qualified for such positions. It found that Gold Bond's "advertising, in-house publications, employee manuals, and job titles present[ed] a pervasive image of an all-male sales force." *Id.* at 24. The advertisements "portray[ed] the company sales force as exclusively male," *id.* at 24; the employee manuals, though revised with some frequency, were consistently "replete with sexist language and [were] clearly written with male employees in mind," *id.* at 24–25. The court found also that "company officials publicly expressed prejudicial opinions about the capabilities of women working in the field as sales persons." *Id.* at 23–24.

In addition, the court cited anecdotal evidence from other women then or previously employed by Gold Bond in sales-related positions. One witness, Bonnie Kaiser, had become a Gold Bond assistant sales serviceman in 1971. At her final interview for that position, the vice president of the company's sales administration department told her that she could never expect to become a full-fledged salesperson because the company did not want women in the field. Kaiser was also advised that she would have to type all of her own correspondence; she was then the company's only female assistant sales serviceman, and she was the only one who received no typing assistance. She was also paid less than her male counterparts.

Another former Gold Bond employee testified that Logsdon generally treated women employees badly. Her own supervisor had told her that Logsdon felt women did not belong in the business world. Indeed, two other witnesses testified that in 1981, when a sales position in the Buffalo district became vacant, Logsdon directed his secretary to put the applications from women in a separate pile.

Still another employee, a female salesperson in Boston, testified that she had once asked regional manager Burgess how Krieger was doing.

[H]e responded, "Lousy. You gals can't sell. You're all right on the service end of the job, and that broad in Waltham [referring to ... another female Gold Bond employee] isn't going to get a sales position either." She then testified that she suggested, if he thought women could not sell, that he ride with her on her calls next time he was in Boston. His response was, "If I ride with you, I ride overnight."

*Id.* at 14–15.

Finally, the court found that Logsdon's treatment of the male salespersons working under him contrasted starkly with his treatment of Krieger. At least one such male, with a performance record quite inferior to that of Krieger, was placed on a managerial track and eventually was made a marketing manager. The court found that Logsdon had a "mind-set" against Krieger, *id.* at 25, and that he had, beginning in 1978, carefully "laid a 'paper trail' documenting his version of the circumstances which would later allow him to ultimately justify her termination," *id.*

The court concluded as follows:

Based on all of the evidence presented during the course of the trial, I conclude that the reasons stated to support the decision to terminate plaintiff's employment are nothing more than mere pretexts. As a result, I find that by firing Ms. Krieger, defendant violated Title VII of the Civil Rights Act of 1964.

*Id.* at 26–27.

The court ordered Krieger reinstated to the position of sales representative. After taking account of Krieger's compensation as a Gold Bond employee and deducting her earnings in jobs taken after she was fired, the court found that Krieger was entitled to backpay in the amount of $60,843.

In a Decision and Order dated November 10, 1987 ("Fee Decision"), the court also awarded Krieger, as the prevailing party, *see* 42 U.S.C. § 2000e–5(k), attorney's fees

in the amount of $51,269 for the litigation. This amount consisted of her attorney's normal fees for the time spent on her case, plus 20% as an "enhancement":

> The difficulty of pursuing a case of this nature and the result obtained warrant that the lodestar be enhanced by 20%. There was extensive discovery and preparation in this case. It was vigorously defended and thus required immaginative [*sic*], persistent prosecution.

Fee Decision at 3.

This appeal followed.

## II. DISCUSSION

On appeal, Gold Bond argues principally that the district court erred in admitting and relying on the evidence that Logsdon required Krieger to file false expense reports and pay him the amounts by which they were inflated; failed to explain why it rejected Gold Bond's evidence suggesting that Krieger's sales performance was poor; failed to make findings with regard to dual motivation; clearly erred in finding that Gold Bond's reasons for terminating Krieger were pretextual; and abused its discretion by including an enhancement in its award of attorney's fees. We have considered all of the arguments advanced by Gold Bond on this appeal and find merit only in its challenge to the enhancement of attorney's fees. Only the arguments mentioned above warrant discussion.

### A. *The Admissibility of the Falsified–Expense–Report Evidence*

Krieger testified that in late 1978, Logsdon became aware that she had not exhausted her expense allowance for the year, and he ordered her to inflate her expense reports to the company and pay him the unspent amounts for which she obtained reimbursement. Krieger resisted, but Logsdon handed her blank restaurant receipts and ordered her to comply. Krieger did so, and three of her checks evidencing such payments to Logsdon were admitted at trial. Gold Bond now contends that this evidence should have been excluded as character evidence unauthorized by Fed.R. Evid. 404 and as impeachment evidence unauthorized by Fed.R.Evid. 608(b). We disagree.

■ First, though Gold Bond's brief on appeal states that its trial attorney "objected to the admissibility of this evidence," the record belies this representation. Krieger's testimony on this subject was given without any objection whatever. Her checks to Logsdon were admitted in evidence in accordance with a stipulation between the parties. Later, when Logsdon was called as a witness by Gold Bond, its counsel questioned Logsdon with respect to this matter. Logsdon admitted these demands, and Gold Bond sought to elicit favorable circumstances justifying them. It is only after some seven pages of cross-examination of Logsdon by Krieger that the record reveals any objection by Gold Bond; and the only stated basis of that objection was repetitiousness: "MR. KATZE [counsel for Gold Bond]: I'm going to impose [*sic*] an objection. This issue has been treated at some length. The witness has been asked repeatedly—." (Trial Transcript ("Tr.") 617) No objection was made on grounds of admissibility. Accordingly, Gold Bond's present arguments that the evidence was inadmissible have been waived. *See United States v. Singh*, 628 F.2d 758, 762 (2d Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980); *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977).

■ Even if Gold Bond had objected at trial to the admissibility of the evidence, we would find no abuse of discretion in the court's receipt of it under Rule 404(b). Although Rule 404 prohibits the use of character evidence or evidence of other wrongs to show that a person acted in conformity therewith on a given occasion, Rule 404(b) permits the use of evidence of "other crimes, wrongs, or acts" for other purposes, such as to prove motive or intent. To establish disparate treatment under Title VII, a plaintiff must prove discriminatory intent, *see, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and such intent

may be proven through circumstantial evidence, *see id.; United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983), such as evidence of past conduct or incidents, *see Schmitz v. St. Regis Paper Co.,* 811 F.2d 131, 132 (2d Cir.1987) (per curiam). The trial court found the false-expense-account demands to be probative of Logsdon's inconsistent standards as applied to Krieger regarding paperwork and company policies. "Particular deference is properly accorded to a ruling of the trial judge with respect to relevancy," *United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir.), *cert. denied,* 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed. 2d 67 (1985), and we see no abuse of the court's discretion in admitting the evidence for this purpose. Since the evidence was admissible under Rule 404(b), Gold Bond's argument that its use for impeachment was not authorized by Rule 608(b) is moot.

## B. *The Adequacy of the Trial Court's Findings of Fact*

Gold Bond mounts three principal attacks on the trial court's findings of fact. It contends that the finding that Krieger's sales performance was good is inadequate because the court failed to refer to expert evidence presented by Gold Bond suggesting that her performance was poor; that the findings as to pretext are clearly erroneous; and that the court erred in failing to analyze the case as a "dual-motivation" case. We find no merit in any of these contentions.

In an effort to rebut Krieger's evidence that her sales performance had been good, Gold Bond offered statistics and testimony from an expert econometrician, Dr. Bernard R. Siskin, suggesting that Krieger's performance had been among the worst of all the company's salespersons in the Buffalo district. Gold Bond contends on appeal that the district court's finding that Krieger's sales performance was good must be set aside because the court did not "refer to and explain why it rejected" the Siskin evidence. We disagree.

■ Fed.R.Civ.P. 52(a) requires the district court, as trier of fact, to "find the facts specially." This requires the court to make sufficiently detailed findings to inform the appellate court of the basis of the decision and to permit intelligent appellate review. *See Kelley v. Everglades Drainage District,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943); *Badgley v. Santacroce,* 815 F.2d 888, 889 (2d Cir. 1987) (per curiam) (and cases cited therein); *Ratliff v. Governor's Highway Safety Program,* 791 F.2d 394, 400 (5th Cir.1986). But nothing in the Rules requires "[ ]either punctilious detail [ ]or slavish tracing of the claims issue by issue and witness by witness." *Id.*

The findings in the present case fully complied with Rule 52(a). The description of the facts found covered half of the court's 29–page opinion. The description was neither perfunctory nor conclusory nor vague. The court buttressed its findings with detailed references to testimony and documentary evidence it chose to credit. The findings are fully adequate to permit appellate review.

Further, we see no basis for believing that the court failed to give the Siskin evidence due consideration; certainly the evidence—as explicated on both direct and cross-examination—was not so intrinsically persuasive that the court was compelled to adopt the expert's view that Krieger's sales performance was poor. For example, Siskin admitted that "the whole period in question which [he] studied" began with 1978 (Tr. 794); he thus had ignored 1976 (in which Krieger sold 111% of her quota) and 1977 (in which she sold 133% of her quota). He was also unaware that in 1978, for which he ranked Krieger "very low," her quota had been raised by 43% over 1977, and that her sales for 1978 were in fact $10,000 higher than in 1977 (leading to contemporaneous praise by the company). Further, Siskin had eliminated from his consideration April 1981, the last month of Krieger's probation before she was fired; he admitted that inclusion of that month would have placed Krieger's performance near the top of all the company's salespersons.

In setting out its findings that Krieger performed well as a sales representative, the court did not suggest that there was no countervailing evidence; rather, having received the Siskin evidence at trial "for whatever value it has in the composite of the total evidence before me" (Tr. 855), the court ultimately found that "the overwhelming *weight* of the evidence" showed that Krieger's sales performance was good throughout her tenure as a salesperson, Decision at 19 (emphasis added). We have no reason to believe that the court did not consider all of the evidence before it; it was not required to mention evidence it considered to be of little value.

■ We also reject Gold Bond's challenge to the court's findings that the company's proffered reasons for the firing of Krieger were merely pretext. Rule 52(a) provides that findings of fact made by the district court as the trier of fact "shall not be set aside unless clearly erroneous, and [that] due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R. Civ.P. 52(a). A finding of fact is not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Further, as stated by the Court more recently in *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985),

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573–74, 105 S.Ct. at 1511–12. Where the trial court's findings are based on credibility determinations, "even greater deference" is required:

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* at 575, 105 S.Ct. at 1512. The question of whether a given discriminatory effect reflects an intent to discriminate on an impermissible basis "is a pure question of fact, subject to Rule 52(a)'s clearly-erroneous standard." *Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982).

The issues raised by Gold Bond's argument that its reasons for firing Krieger were unrelated to her gender created pure questions of fact as to whether the reasons proffered were genuine or were instead pretextuous. The court found each proffered reason to be merely pretext, and there was ample evidence in the record to support its inferences. As described in greater detail above, it found that Krieger's sales performance—the company's primary demand of its salespersons—was good throughout her tenure as a Gold Bond salesperson. Despite being assigned to unpromising territories, Krieger exceeded her quotas in several years; even in two years in which she fell short of her quotas her sales performance was rated as "very acceptable" or as "quota bust[ing]"; and at the low ebb of her performance, when she met only 87% of her quota, she was above average, outperforming many of her male counterparts who were then averaging less than 80% of their quotas.

The company attempted to prove its proffered gender-neutral reasons chiefly through the testimony of Logsdon. The court expressly found Logsdon not to be a credible witness. Rather, it found that Logsdon had a "mind-set" against Krieger, had applied a double standard where she was concerned, and had carefully crafted a " 'paper trail' " to justify her eventual firing. Its finding that the firing was not gender neutral was supported not only by the substantial proof that the company preferred not to have female salespersons but

as well by the ample evidence that every flaw attributed to Krieger by Gold Bond in support of the firing was shared by many of its male salespersons and that Krieger's alleged flaws were no worse than theirs. Yet Krieger was placed on probation; the men were not. She was fired; they were not. The court's inference that the reasons proffered by the company for its action were not genuine reasons but merely pretext can hardly be termed clearly erroneous.

■ Finally, we see no merit in Gold Bond's contention that the trial court erred in failing to apply the dual-motivation analysis set forth in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Mt. Healthy* analysis is applied in an employment discrimination case in which the termination decision is found to be based on more than one reason, one of which is unlawful and the other(s) not. *See Brock v. Casey Truck Sales*, 839 F.2d 872, 878 (2d Cir.1988). Though the trial court here found that Gold Bond's proffer of nondiscriminatory reasons sufficed to create a genuine issue of fact, it found the facts not to be as the company asserted. Since each of the reasons advanced by Gold Bond for its termination was found by the district court to be no more than a pretext, there was only one proven reason for the termination, and that was gender discrimination. Dual-motivation analysis under *Mt. Healthy* would thus have been inappropriate.

In sum, we conclude that Gold Bond has presented no basis for overturning the trial court's findings of fact.

## C. The Enhancement of the Award of Attorney's Fees

■ The district court calculated the attorney's fees to be awarded Krieger for the present litigation by (1) multiplying the time spent by her attorney and his staff by their normal hourly rates, and (2) adding 20% to the total as enhancement. Gold Bond contends that the enhancement was unwarranted in light of the Supreme Court's decision in *Pennsylvania v. Dela-*

*ware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098–99, 92 L.Ed.2d 439 (1986) ("Delaware Valley I"). We agree.

In a Title VII case, the district court "in its discretion, may allow the prevailing party ... a reasonable attorney's fee." 42 U.S.C. § 2000e–5(k) (1982). Having noted that "in some cases of exceptional success an enhanced award may be justified," *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (construing 42 U.S.C. § 1988 (1982)), the Supreme Court has since concluded that the product of a reasonable hourly rate multiplied by a reasonable number of hours presumptively equals the "reasonable" fee to which the attorney may be statutorily entitled, *see Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (§ 1988), and that enhancement of an award may no longer be justified on the basis of factors such as the novelty of the issues, the complexity of the litigation, the high quality of the representation, or the number of people benefited. *Id.* at 898–900, 104 S.Ct. at 1548–49; *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098; *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (restricting availability of enhancement of fees for risk of nonpayment associated with litigation). These factors are assumed to be already reflected in the hourly rate and number of hours charged by the attorney and thus cannot be counted again to support an enhancement: "Although upward adjustments of the lodestar figure are still permissible, ... such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098 (quoting *Blum v. Stenson*, 465 U.S. at 899, 104 S.Ct. at 1549).

In the present case, the court awarded enhancement because of the difficulty of the work involved in this type of case, the extensive discovery and preparation required, plaintiff's attorney's imaginative,

persistent prosecution in the face of Gold Bond's vigorous defense, and the result obtained. These, however, are factors the Supreme Court has described as subsumed within the lodestar. The district court did not indicate that it felt this case was particularly difficult in comparison with other Title VII cases; nor did it make any other findings to support the view that this was a rare or exceptional case. We conclude that enhancement was impermissible, and we therefore remand for a recalculation of the attorney's fees to be awarded without enhancement, and the entry of a new judgment reflecting the new calculation.

### CONCLUSION

The judgment of the district court is vacated insofar as it includes an enhancement in the attorney's fee award and is in all other respects affirmed. We remand for entry of a new judgment consistent with the foregoing.

Costs to plaintiff.