**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-20216

DARRELL B TAYLOR

Plaintiff-Appellant

v.

PEERLESS INDUSTRIES INC

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CV-2964

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Darrell B. Taylor, a black male, brought this suit against Defendant-Appellee Peerless Industries, Inc., a manufacturer of metal support brackets for audio and visual devices, alleging that Peerless fired him as a district sales representative because of his race in violation of both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. The district court granted summary judgment in favor of Peerless, but this court vacated that judgment and remanded the suit to the district court on the grounds that the

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

district court erred by failing to apply the "modified" *McDonnell Douglas* test used in this circuit. On remand, the district court again granted summary judgment in favor of Peerless, finding that, under the modified *McDonnell Douglas* test, Taylor had made out a prima facie case of discrimination but had failed to show that Peerless's stated reason for firing Taylor was pretextual or that race was a motivating factor. The district court also found that Peerless would have made the decision to fire Taylor regardless of any discriminatory animus.

Taylor now appeals the district court's second grant of summary judgment, asserting that Taylor's superior sales performance demonstrates that Peerless's stated reason for firing Taylor—that he had neglected to comply with management's directives concerning how he was to perform his job and that this was causing him to be ineffective in the field—was a pretext for race discrimination and, alternatively, that even if the stated reason for Taylor's dismissal was true, Peerless's unfavorable treatment of Taylor with respect to pay, evaluations, and job demands relative to white employees; failure to comply with its progressive disciplinary policy; and failure to hire and maintain a more racially diverse workforce, demonstrate that race was also a motivating factor in his dismissal. Taylor also asserts that the district court's finding that Peerless would have fired Taylor even if race had been a motivating factor is speculative and inherently a fact question for a jury.

Peerless responds that sales volume alone is not the sole measure of a salesperson's effectiveness, and that Taylor's sales volume in particular is not a reliable indicator of his effectiveness because he merely serviced existing accounts and did not secure additional clients or sales. Peerless asserts that Taylor was an ineffective salesperson because he failed to call on customers or generate new business, he failed to use the customer management database, and his communication with management was almost nonexistent. Peerless

contends that Taylor was treated unfavorably relative to white employees solely because of Taylor's unique performance problems and that Taylor has failed to identify any white employees who had the same performance problems as Taylor yet were treated differently; that Peerless complied with its progressive disciplinary policy; and that Taylor's evidence concerning Peerless's hiring practices are inaccurate and inconclusive. Peerless asserts that the question of whether Peerless would have fired Taylor even if race had been a motivating factor is the proper subject of a summary judgment ruling.[1]

For the reasons stated below, we AFFIRM.

## I.    Background

Prior to working for Peerless, Taylor had seventeen years of experience in sales at companies such as Bose Corporation, Western Union, and Philips Consumer Electronics. Peerless hired Taylor in October 2001 as a district sales representative in the professional sales department. There were approximately ten employees in the sales force. Taylor was the only salesperson who was black; the others were white. Taylor was responsible for Peerless's South District, which included Texas, Oklahoma, Arkansas, and Louisiana. Taylor's direct supervisor at Peerless was Kevin McDonald, the southern regional sales

---

[1]Peerless also asserts that Taylor has failed to make out a prima facie case of discrimination on the grounds that Taylor was not qualified for the position because he lacked the minimum qualifications for his position, such as effective writing and communication skills, and because he performed poorly. Peerless's argument that Taylor lacked the minimum qualifications for the position is belied by the fact that Peerless hired Taylor in the first place, and performance concerns are more appropriately addressed in assessing a plaintiff's assertion that an employer's articulated reason for its action was a pretext. *See Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 350–51 (5th Cir. 2007) ("Although Washington Mutual submitted evidence that Berquist's supervisors were not pleased with his performance, this evidence does not prove a lack of qualifications at the prima facie stage."); *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988) ("[A] plaintiff challenging his termination or demotion can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action. The lines of battle may then be drawn over the employer's articulated reason for its action and whether that reason is a pretext for age discrimination.").

manager.  Beginning in August 2002, McDonald began reporting to Tom Connolly, the new director of professional sales.  Connolly reported to Ken Johnson, the vice president of sales and marketing.

In 2002, Taylor had the highest sales volume at Peerless and received an award for being the "number one" salesperson at the sales award dinner at the end of the year.  In that year, he exceeded his sales quota by 29.2% and increased sales in his district by 58.1%.  Taylor's biggest customer was Ultrak, a company that had been a Peerless customer prior to Taylor's arrival at Peerless.  Excluding sales to Ultrak, Taylor's sales increased 28.5% in 2002 and were still above his sales quota.  McDonald gave Taylor a "1" on each of his quarterly performance reviews in 2002, which were graded on a 0–2 scale.  Peerless used the following half-point incremental rating scale: a "2" is considered exceptional; a "1.5" is considered outstanding; a "1" is considered good; and a ".5" is considered below standard.  McDonald's comments in these reviews were generally positive, praising Taylor for his willingness to help customers, learning quickly about Peerless's business, coming up with good ideas at sales meetings, making business contacts and building dealer relationships, accepting feedback, his energy and enthusiasm for his job, and his sales performance.  In his third and fourth quarter reviews, McDonald stated that Taylor needed to improve on communicating with his customers and McDonald on a timely and consistent basis, scheduling his time, and planning his work, but McDonald stated that, on the whole, Taylor had "done a good job in 2002" and was open to feedback for ways to improve his work.  In his third-quarter self-evaluation, Taylor stated that his general performance had been good and that one of his current goals was to "improve all levels of communication, both internal and external."

Connolly ordered all sales representatives to submit a detailed sales plan for 2003 by January 6, 2003.  Taylor turned in his sales plan on January 8, two

days late. Connolly was dissatisfied with Taylor's sales plan and ordered him to submit a revised version because the first plan Taylor submitted was based on inaccurate sales figures from the prior year, did not follow the specified format, and did not specifically discuss how Taylor intended to increase sales. Connolly testified that he believed Taylor did not put much time or effort into preparing the plan and that the inaccurate figures demonstrated that he did not understand his territory and existing accounts very well. Taylor submitted a revised plan with accurate sales figures, but Connolly was dissatisfied with the revised report because it did not specifically discuss how Taylor intended to increase sales. However, Connolly accepted Taylor's revised sales plan and did not request that Taylor again revise his sales plan.

Taylor received a three-percent merit increase in pay on February 3, 2003 based on his performance in 2002. The average merit pay increase for Peerless's sales force that year was four percent, and ranged between two and five or six percent. Connolly testified that the amount of the increase was based on sales performance and professional comportment, i.e., how well the salesperson worked with associates and customers, follow-up skills, knowledge of products, and activity levels. He stated that he did not rely strongly on sales figures in assessing sales performance because they were not a reliable indicator of a salesperson's effectiveness due to the fact that an individual's sales could increase or decrease as a result of events over which he had no control. Connolly stated that he tried "to fairly evenly divide the balance of the monies because I didn't have a good way of making a serious judgment there."

Some time in February 2003, one of the largest customers in Taylor's territory told McDonald that Taylor had never met with that customer in person, and another customer told McDonald that Taylor had not met with that customer since February 2002. McDonald and Connolly reviewed Taylor's expense and activity reports to track Taylor's contacts with customers. Connolly

asserted that they found that Taylor was not timely in submitting itineraries or activity reports to justify his time in the field; he was not making sufficient sales calls or generating sufficient new business; he was not properly using Peerless's customer management database system to track his contacts; his sales presentations were disorganized and unscheduled; and his expense reports were not timely.

On March 20, 2003, Connolly instructed McDonald to have a meeting with Taylor about Taylor's performance. Connolly testified that Taylor had strong sales numbers at the time, but that Connolly was concerned about whether Taylor was doing the necessary work to secure future sales and was unable to assess this based on the limited feedback Connolly was receiving from Taylor. In the meeting, McDonald and Taylor discussed the need for scheduling in advance twelve face-to-face calls each week, returning e-mails and phone calls in a timely fashion, developing better time management skills, and improving organization and efficient use of work e-mail. When asked about his contacts with the customers who informed McDonald about their lack of face-to-face contact with Taylor, Taylor told McDonald that he had spoken with them numerous times by telephone. McDonald sent Connolly a memo on March 24 reporting on the contents of the meeting. McDonald noted in the memo that Peerless customer service representatives had repeatedly told McDonald that they had difficulty getting in contact with Taylor.

On March 27, 2003, Connolly called Taylor to discuss Taylor's performance. Connolly informed Taylor that his performance had been deficient for the following reasons: his 2003 sales plan was late, included incorrect data, and showed little insight into his sales objectives; for the first quarter of 2003, he made only two calls on prospective customers, while other sales representatives made at least one per week; he had never visited one of the largest customers in his territory and had not visited another in more than a

year; for the first quarter of 2003, he made only 29 calls on customers, and was expected to make at least 12 per week; he did not use the customer management database—he had entered only 67 contact names into the system, some of which were duplicates, when he was expected to enter at least 200 contact names; he made "drop-bys" rather than scheduled customer meetings; he failed to contact, per Connolly's direction, a particular customer; he was unorganized on sales calls; and he did not adequately communicate with management.

Connolly, rather than McDonald, completed Taylor's performance review for the first quarter of 2003. The review, issued on March 28, was sharply critical and gave Taylor a ".5" rating, indicating that his work was below standard. The review stated that Taylor had been slow to adapt to the new focus and responsibilities of his position and that his sales activities had not met Connolly's expectations. The review emphasized Taylor's failure to become more organized in his work, communicate effectively, plan ahead, timely respond to telephone calls and e-mails, and make face-to-face appointments with customers, and repeated the same specific criticisms of Taylor's performance that Connolly had made in their telephone conversation the day before. The review stated that Taylor was not uncovering many meaningful new business opportunities or developing stronger relationships with the significant dealers in his district, that he was more comfortable going back to the same contacts with the same dealers rather than finding new contacts, that his sales number were deceiving because the Ultrak account was driving virtually all of his growth and much of his volume, and that his sales volume with other accounts was much less impressive and indicative of a sales pattern that was not effective. The performance review stated that Taylor was required to immediately address the specific expectations laid out in the review, including planning sales calls in advance; making at least 12 face-to-face sales calls each week; planning specific sales objectives for each call; recording sales-call results in the customer database system; submitting

weekly expense reports; meeting face-to-face with all significant dealers in his district within the month; securing three appointments with computer accessory dealers or resellers within the next month; opening three new accounts within the next month; providing responsive and accurate communication; and growing his book of business.

Connolly asserted that in April 2003, he orally instructed Taylor, on two separate occasions, to call him twice each week to check in. Connolly sent Taylor an e-mail on April 17 stating that Taylor had not complied with Connolly's directive to call him twice each week and reminding him to do so. Taylor disputed this account, stating that Connolly told him to call *either* Connolly or McDonald twice each week, but he conceded that he did not call Connolly as directed after receiving the e-mail. Connolly also asserted that Taylor failed to satisfy the performance expectations outlined in his performance review.

On May 2, 2003, Taylor was fired and replaced by a white male. At the time he was fired, Taylor was ahead of his sales quota and had ranked either first or second in sales in the preceding four months. In Taylor's letter of termination, Peerless stated that "as was noted extensively in your First Quarter Performance Review, there have been a growing list of things you have chosen not to act upon in a timely fashion that is causing you to be largely ineffective in the field," and "[t]here has been little activity in the past few weeks to support any change in the effective use of your sales time."

## II.    The Applicable Legal Standards

### A.    The Standard of Review

This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. *See XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 149 (5th Cir. 2008); *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996). Summary judgment is proper if the record reflects "that there is no genuine issue as to any material

8

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## B.     The Modified McDonnell Douglas Test

Under Title VII, it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Section 1981 grants equal rights to "make and enforce contracts," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)–(b). Title VII and section 1981 claims require the same proof to establish liability when used as parallel causes of action. *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986).

This court recognizes a modified *McDonnell Douglas* burden-shifting framework to analyze claims of discrimination where, as here, the plaintiff relies on circumstantial evidence. *See Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 311 n.8 & 312 (5th Cir. 2004) (following the Supreme Court's decision, after Title VII's amendment, in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)); *see also Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). Under this approach, the plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is qualified for the position at issue; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or was treated less favorably than similarly-situated employees outside the protected class. *Rachid*, 376 F.3d at 312; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Rachid*, 376 F.3d at 312. If the defendant satisfies its burden of production, the burden then shifts back to the plaintiff to offer sufficient evidence to create a genuine issue of material fact that

either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and the plaintiff's protected characteristic was a "motivating factor" in its decision. *Id.* If the plaintiff demonstrates that the protected characteristic was a motivating factor in the employment decision, it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, the plaintiff prevails. *Id.*

## III. Analysis

### A. Pretext

Peerless informed Taylor that he was fired for failing to comply with management's directives concerning how he was to perform his job, which had resulted in him being ineffective in the field. Specifically, in Taylor's letter of termination, Peerless stated that "as was noted extensively in your First Quarter Performance Review, there have been a growing list of things you have chosen not to act upon in a timely fashion that is causing you to be largely ineffective in the field," and "[t]here has been little activity in the past few weeks to support any change in the effective use of your sales time." Taylor asserts that his sales numbers demonstrate that this legitimate, nondiscriminatory reason is false and is a pretext for discrimination. Peerless does not dispute that Taylor had good sales numbers, but asserts that sales volume alone is not the sole measure of a salesperson's effectiveness, and that Taylor's sales volume in particular is not a reliable indicator of his effectiveness because he merely serviced large existing clients and did not secure additional clients or sales. Peerless asserts that Taylor was an ineffective salesperson because he failed to call on customers or generate new business, he failed to use the customer management database, and his communication management was almost nonexistent.

We believe that this case is similar to *Baker v. Randstad North America,*

*L.P.*, 151 F. App'x 314 (5th Cir. 2005), in which this court held that evidence that a salesperson was the highest revenue generator in his market did not raise a genuine issue of material fact as to whether his employer's reason for firing him—his poor sales performance—was pretextual. In *Baker*, the employer considered a number of factors in addition to revenue-generation in assessing sales performance, including productivity, the ability to generate new business, and contacting and having meetings with clients. This court found that the evidence concerning the plaintiff's high revenue generation failed to raise a fact issue as to pretext because the employer's assertion that the plaintiff was the poorest-performing salesperson was based on the fact that he was ranked poorly under all of the other performance indices considered by the employer, and that his high revenue was not a reflection of good sales performance because it was due solely to a single large account that the plaintiff had secured early in his employment and was "living off" that ended up having negative profitability due to high costs and was eventually dropped. *Id.* at 319.

Similar to the employer in *Baker*, Peerless considered a number of criteria in addition to recorded sales in assessing sales performance, including the frequency with which a salesperson called on customers, the ability to generate new business, use of the customer management database, and communication with management. While Taylor's sales numbers cannot be as easily discounted as those in *Baker*,[2] we hold that Taylor's sales numbers by themselves are not

---

[2] Taylor submitted evidence not only that he had a high sales volume, but that he consistently exceeded his sales quota in 2002 and 2003, which Peerless could have adjusted to account for his inheritance of large sales accounts, changing market conditions, or simply a belief that Taylor could and should be able to make more sales. Connolly testified that he reviewed each salesperson's sales figures and that sometimes it was unclear whether the salesperson was actually responsible for their sales, and that he did not believe that sales figures were a reliable indicator of a salesperson's effectiveness due to the fact that an individual's sales could increase or decrease as a result of events over which he had no control. However, Connolly's asserted belief in the unreliability of these figures is belied by the fact that Peerless still set sales quotas for its salespeople and gave awards for high sales volume. Moreover, a

sufficient to raise a fact issue as to pretext because of the significance of the specific alleged performance deficiencies in Taylor's effectiveness as a salesperson and the fact that Taylor has failed to submit evidence to rebut the bulk of those allegations. The mere fact that a salesperson has achieved high sales numbers over a relatively short period of time—here, less than two years—does not mean that a salesperson is effective in the field if the undisputed evidence shows that the salesperson has neglected to do the reasonable tasks requested by his employer in order to maintain or increase sales in the future and to allow the employer to develop and execute sales strategies and ensure compliance with those strategies.

Taylor cites several cases from our sister circuits holding that evidence that a salesperson achieved a significant sales volume may show that the salesperson performed their job effectively and that an asserted performance-based reason for their firing was pretextual. In *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915 (8th Cir. 2000), the court found that a salesperson who had been demoted by his employer, ostensibly because he lacked sufficient product knowledge, could not effectively communicate with customers, and acted unprofessionally during sales calls, had raised a fact issue as to whether he performed his job at a level that met his employer's legitimate expectations and whether the asserted reasons for his demotion were pretextual by presenting testimony by a customer and manager that he was proficient at selling his company's products, supplemented by past performance evaluations praising his

---

salesperson's sales volume is always subject to uncontrollable variables such as market conditions. Even excluding sales to Ultrak, Taylor's sales increased 28.5% in 2002 and were still above his sales quota. In his deposition, Connolly testified that he believed that the 28.5% increase was due to a good economic climate, changes in state spending, and other contracts that were already in place when Taylor started working for Ultrak, but he conceded that this was simply his general impression and that he was unable to accurately assess what portion of the 28.5% increase was due to these various factors. Connolly stated that "I determined that I couldn't determine" how much credit Taylor should have been given for the 28.5% increase.

12

performance that corroborated this testimony. *Id.* at 920–21. The *Fisher* court stated that "the selling of product is the primary responsibility of a salesperson and thus that sales volume is generally the principal indicator of a salesperson's performance."[3] *Id.* at 920 (citing *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999)). The court contrasted sales positions with more multifaceted jobs in which job performance could not as easily be reduced to a single metric. *Id.* at 920.

Taylor also cites *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3d Cir. 1995), in which the court similarly held that a salesperson's excellent sales figures could show that firing that salesperson for "performance problems," when those problems related to organizational skills rather than actual sales, was a pretext for discrimination. In *Brewer*, the court held that a salesperson had raised a fact issue as to whether the legitimate, non-discriminatory reasons for terminating his employment—poor follow-up on customer requests, poor communication with clients and with management, too little time spent in his territory, and late and ambiguous sales reports—were only a pretext for discrimination by (1) testifying about specific examples of his supervisor's errant or misplaced criticisms in order to dispute the significance of the problems raised by his supervisor and (2) submitting evidence that he had previously received positive evaluations and bonuses for surpassing his sales quota in the two years before he was fired (the most recent given three months before he was fired), and had been the only salesperson in his region to exceed his or her sales quota for those two years. *Id.* at 331–32. The court based its ruling on its observation

---

[3]The Eighth Circuit considers whether a plaintiff "was performing his job at a level that met his employer's legitimate expectations" as a question properly considered in assessing whether a plaintiff has satisfied the "qualified" prong of the prima facie showing in a termination or demotion case, in contrast to the rule in this circuit that such performance concerns are more appropriately addressed in assessing a plaintiff's assertion that an employer's articulated reason for its action was a pretext. *See Berquist*, 500 F.3d at 350–51; *Bienkowski*, 851 F.2d at 1506.

that "the volume of sales may always be the primary measure of a salesperson's performance," and that "segregat[ing] job performance into the neat categories of sales and organizational skills defies the reality of the role of a salesperson in a company." *Id*. at 331–32 (citing *Kiliszewski v. Overnite Transp. Co.*, 818 F. Supp. 128, 132 (W.D. Pa. 1993)). The court conceded that "[a]n employer may have a legitimate reason for firing an employee that has nothing to do with that employee's performance of the core functions of his or her job," but held that the plaintiff's "deficiencies pale beside his consistently good sales performance, inexplicably unaccounted for in his supervisor's negative evaluations" and that "[a] factfinder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by [the employer's] own performance incentive program—sales." *Id*. at 332.

Finally, Taylor cites *Krieger v. Gold Bond Building Products*, 863 F.2d 1091 (2d Cir. 1988), in which the Second Circuit upheld the trial court's factual finding that an employer's legitimate, non-discriminatory reasons for terminating a female salesperson—her poor paperwork, her failure to sell the full range of the company's products, and her use of her home telephone to contact customers—were pretextual, on the grounds that the salesperson had a record of either exceeding her sales quotas or at least exceeding the sales figures posted by many of her male counterparts; evidence that the company preferred not to have female salespeople; and evidence that the flaws attributed to the fired female salesperson were shared by many of her male coworkers, none of whom were fired for similar reasons. *Id*. at 1098–99.

None of the cases from our sister circuits cited by Taylor hold that evidence of a salesperson's significant sales volume by itself is always sufficient to raise a fact issue as to whether the salesperson performed their job effectively or whether an asserted performance-based reason for their firing was pretextual. In *Fisher*, the salesperson's evidence concerning his sales proficiency—testimony

by a customer and manager, supplemented by past performance evaluations—directly rebutted the specific alleged performance deficiencies cited by the employer, including a lack of product knowledge, poor communication with customers, and unprofessional conduct during sales calls. 225 F.3d at 920–21. The customer testified that the salesperson had always presented his company's products in a way that demonstrated the benefit of their use to the customer; the salesperson's past performance evaluations gave him high marks for his product knowledge; and the manager testified that the salesperson's ability to "talk country," or relate to customers who did not have a high level of education, and his ability to build rapport with clients by talking about social matters rather than strictly business issues, actually enhanced his ability to sell products. By contrast, Taylor's evidence concerning his sales proficiency—his sales numbers—do not rebut the specific performance deficiencies cited by Peerless, including failing to call on customers, failing to generate new business, failing to use the customer management database, and communicating effectively. Rather, Taylor asserts that previously recorded sales volume is the sole legitimate measure of a salesperson's effectiveness, and that his alleged deficiencies in other areas are secondary measures of performance that should be discounted in the face of sales-volume evidence.

With regard to the statement in *Fisher* that "the selling of product is the primary responsibility of a salesperson and thus that sales volume is *generally* the *principal* indicator of a salesperson's performance," *id.* at 920 (emphasis added), the qualifiers "generally" and "principal" make clear that the *Fisher* court did not mean to embrace an absolute rule that evidence of a salesperson's significant sales volume by itself is always sufficient to raise a fact issue as to whether the salesperson performed his job effectively. That statement clearly contemplates that there are other relevant indicators that may provide a better or more complete picture of a salesperson's performance. In this case, although

15

Taylor had good sales numbers, his documented failure to call on customers, generate new business, use the customer management database, and communicate effectively could reasonably have been viewed as jeopardizing his ability to maintain or increase sales in the future and as undermining Peerless's ability to develop and execute strategies designed to maintain or increase sales in Taylor's district and ensure compliance with those strategies. Indeed, one of the largest customers in Taylor's territory told McDonald that Taylor had never met with that customer in person, and another customer told McDonald that Taylor had not met with that customer since February 2002. Taylor's sales volume clearly presents an incomplete picture of his performance and is not by itself sufficient to raise a fact issue as to whether he was actually effective in the field.

*Brewer* is distinguishable on similar grounds. In *Brewer*, as in *Fisher*, the salesperson presented testimony directly rebutting the extent and degree of the specific alleged performance deficiencies cited by the employer, including poor follow-up on customer requests, poor communication with clients and with management, too little time spent in his territory, and late and ambiguous sales reports. 72 F.3d at 331. As discussed above, Taylor does not attempt to rebut most of the alleged specific deficiencies in his performance.[4] The primary thrust of his argument is that his sales numbers show that he was an effective salesperson *in spite of* the specific deficiencies cited by Peerless. As for the *Brewer* court's observation that "the volume of sales *may* always be the primary measure of a salesperson's performance," *id.* at 331–32 (emphasis added), that statement is couched in the same qualified language as the statement in *Fisher* that "sales volume is *generally* the *principal* indicator of a salesperson's

---

[4]Taylor does present evidence to dispute some of the alleged deficiencies in his performance, including evidence that he opened two new accounts after his first-quarter performance review in 2003 and that he secured a verbal commitment on a third account on the day before he was terminated.

performance," 225 F.3d at 920–21 (emphasis added). We do not disagree with the *Brewer* court's statement that "segregat[ing] job performance into the neat categories of sales and organizational skills defies the reality of the role of a salesperson in a company," 72 F.3d at 332 (emphasis added), but believe that the performance deficiencies cited by Peerless directly concerned his ability to maintain or increase sales in the future and Peerless's ability to develop and execute strategies designed to maintain or increase sales in Taylor's district and ensure compliance with those strategies.

Finally, *Krieger* is distinguishable on the grounds that the salesperson submitted relevant evidence of discrimination in addition to her sales figures, including evidence that the company preferred not to have female salespeople and that the flaws attributed to the fired female salesperson were shared by many of her male coworkers, none of whom were fired for similar reasons. 863 F.2d at 1098–99. Here, Taylor relies solely on his sales figures to establish pretext.[5]

Taylor has failed to raise a genuine issue of material fact as to whether Peerless's stated reason for his termination is false and a pretext for discrimination

## B. Race as a Motivating Factor

Taylor argues that even if the stated reason for Taylor's dismissal was true, Peerless's unfavorable treatment of Taylor with respect to pay, evaluations,

---

[5]In arguing in the alternative that race was a motivating factor in his dismissal, Taylor asserts that he was treated differently than his white counterparts with respect to pay, evaluations, and job demands; that Peerless did not follow the four steps of progressive discipline contained outlined in the employee handbook; and that Peerless failed to hire and maintain a racially diverse workforce. Taylor's briefs are inconsistent as to whether the evidence that he provides to support these allegations is also being offered to show pretext. Some sections of his briefs specifically state that it is being offered only to show that race was a motivating factor, and the evidence is not discussed in the "pretext" section of his briefing, but he states several times in passing that this evidence can also be used to show pretext. Regardless, as discussed below, this evidence is deficient for numerous reasons and does not provide support for either proposition.

and job demands relative to white employees; failure to comply with its progressive disciplinary policy; and failure to hire and maintain a more racially diverse workforce, demonstrate that race was also a motivating factor in his dismissal. Peerless asserts that Taylor was treated unfavorably relative to white employees solely because of Taylor's unique performance problems and that Taylor has failed to identify any white employees who had the same performance problems as Taylor yet were treated differently; that Peerless complied with its progressive disciplinary policy; and that Taylor's evidence concerning Peerless's hiring practices are inaccurate and inconclusive. In assessing whether a protected characteristic was "a motivating factor," a court must consider the evidence presented by the plaintiff as a whole. *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005).

Taylor has submitted evidence that some Caucasian salespeople occasionally failed to turn in itineraries in advance, make twelve face-to-face sales calls per week, and had problems using the customer management database, but were not fired for any of these failings. Taylor also points out that he received a below-average pay increase, that he was the only salesperson who was directly reviewed by Taylor, and that he was the only employee ordered to immediately address the list of specific expectations laid out in his performance review. To establish discriminatory motive through the different treatment of another employee, that employee's circumstances, including his misconduct, must have been "nearly identical." *See Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 901 (5th Cir. 2002). Taylor has failed to submit any evidence showing that any other individual salesperson was engaged in nearly identical conduct, specifically that they were deficient in all or even a significant number of the areas in which he was deficient or that other salespersons' deficiencies were as severe. In light of the complete lack of evidence concerning the nature and

extent of the deficient conduct engaged in by Taylor's white coworkers, comparing the disciplinary measures Peerless took with respect to Taylor to those it took with respect to his coworkers provides no relevant information regarding whether race played a role in Taylor's termination. *See Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 583 (5th Cir. 2006) (finding that evidence that other employees were treated differently than those in the protected class was not probative on the issue of pretext or whether the employees' protected status was a motivating factor in their termination because the other employees were not similarly situated due to the fact that they did not engage in the same behavior); *Audibert v. Lowe's Home Centers, Inc.*, 152 F. App'x 399, 403 (5th Cir. 2005) ("To demonstrate that these male employees were given preferential treatment *in situations similar to her own*, Audibert needed to provide evidence that they engaged in misconduct nearly identical to the misconduct for which she was allegedly discharged.").[6]

Taylor also contends that Peerless failed to comply with its written progressive disciplinary policy, and that this failure is evidence that race was a motivating factor in his termination. The four steps of progressive discipline outlined in the policy are: (1) first warning; (2) second warning; (3) probation; and (4) termination of employment. The policy specifically notes that these steps

---

[6]Taylor objects to applying the "nearly identical" standard in this case, arguing that it is only used in this circuit when evidence of other employees' treatment is introduced to demonstrate pretext, and not when it is introduced to show that a protected trait was a motivating factor. Taylor does not cite any cases from this circuit in support of this argument, and the rationale for the "nearly identical" standard is equally applicable in both contexts: comparing the treatment of the plaintiff with the treatment of other employees does not permit a reasonable inference of discrimination if differences in their treatment could just as easily be ascribed to their different circumstances as to discrimination. *See Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004). Taylor also argues that even in the context of the pretext analysis, Supreme Court precedent mandates a "comparable seriousness" standard rather than a "nearly identical" standard. This court has considered the precedents cited by Taylor and held that the latter is the appropriate standard. *See id.* at 212–13.

are not mandatory, stating that "specific corrective action will depend on the severity and conditions of the problem," a manager "may employ some, all or none" of the outlined steps, and that "[t]he use and duration of each step, and type of disciplinary action taken, may vary depending on the situation and will be determined within the sole discretion of Peerless Industries, Inc." The policy states that "[e]ach step, if used, may include a review of the details of the problem, the changes needed, and the time frame within which the changes are to occur," and that disciplinary action "may also include suspension with or without pay." Taylor asserts that Peerless failed to comply with its progressive disciplinary policy by bypassing the first three steps outlined in the policy. Taylor notes that Connolly conceded that Taylor was not given a written warning of termination, placed on probation, or suspended, and that Peerless "did not go through the formal steps that are identified" in the policy. Peerless did not violate the written disciplinary policy by declining to follow the four steps of progressive discipline listed in the policy; the policy clearly states that following the steps is not mandatory and that managers maintain significant discretion in determining how to discipline employees.

Taylor argues that an employer's failure to follow a nonmandatory disciplinary policy may still demonstrate that a protected characteristic was a motivating factor in an adverse employment decision. Taylor cites *Machinchick v. PB Power, Inc.*, 398 F.3d 345 (5th Cir. 2005), in which this court stated that "[a]lthough [the employer] correctly notes that its policy is not mandatory, and that [the plaintiff] was an at-will employee, these facts do not eliminate the inference of pretext raised by its failure to follow an internal company policy specifically stating that it should be 'followed in most circumstances.'" *Id*. at 355 n.29. Unlike the policy in *Machinchick*, the policy in this case did not state that it should be "followed in most circumstances." Indeed, Peerless's policy takes great pains to emphasize that the disciplinary measures used in a particular

case will be highly dependant on the specific circumstances and that managers "may employ some, all or none" of the steps. In the absence of any evidence that Peerless generally followed the four steps outlined in its disciplinary policy, or that the policy was applied differently to similarly situated employees, the fact that Peerless did not follow the four steps does not provide any relevant information regarding whether race played a role in Taylor's termination.

Finally, Taylor argues that Peerless's failure to hire and maintain a more racially diverse workforce demonstrates that race was a motivating factor in his dismissal. Taylor has submitted evidence that all eight of the salespeople hired by Connolly were white, and that Connolly interviewed one or two black candidates for several of those positions. Taylor has also submitted evidence that four black employees in the customer service department were fired or resigned during the tenure of Ken Johnson, Connolly's supervisor. Taylor asserts that there was an overall lack of racial diversity at Peerless: Taylor was the only black salesperson; only one black employee was in a management position (human resources manager); and all regional sales managers and "upper management" were white. Peerless contends that Taylor has mischaracterized its hiring practices and the diversity of its workforce. Peerless asserts that Taylor has ignored the following relevant facts about the treatment of employees in the customer service department: there are currently five black employees in the department; two white employees were fired and four resigned; a black employee replaced another fired black employee; two black employees were hired to replace two white employees who were fired; and Johnson himself hired two black employees. Peerless also argues that human resource manager is an "upper management position," and therefore that it does have one black employee in "upper management."

Taylor's statistical evidence, when considered in context and along with the other evidence in the record, does not permit a reasonable inference that race

was a motivating factor in Taylor's termination. Taylor has failed to present any evidence concerning the number of qualified black job applicants for sales and managerial positions; a more comprehensive view of hiring practices in the customer service department reveals no discernible discriminatory pattern; and, as discussed above, Taylor has failed to point to other circumstantial evidence that could support a reasonable inference that race was a motivating factor in his termination. Although statistical evidence is not subjected to the same exacting standards in disparate treatment cases as it is in disparate impact cases, *see Deloach v. Delchamps, Inc.*, 897 F.2d 815, 820 (5th Cir. 1990), Taylor's statistical evidence simply does seem not shed any light on the role that race may have played in Peerless's employment practices, *see Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 583 (5th Cir. 2006) ("These statistics are not probative of discriminatory intent because they are devoid of context."); *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345–46 (5th Cir. 2005) ("Keelan's statistical evidence and pro-Indian remarks do not create a fact issue on pretext. Being a majority Indian company did not prevent Majesco from also firing Indians for nonperformance in sales."); *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1185 (5th Cir. 1996) ("The probative value of statistical evidence ultimately depends on all the surrounding facts, circumstances, and other evidence of discrimination.").

Taylor's evidence does not raise a fact issue as to whether his ineffectiveness in the field was only one reason for Peerless's decision to fire Taylor, and that Taylor's race was a motivating factor in the decision. Taken together, Taylor's evidence that he was treated differently than his white counterparts with respect to pay, evaluations, and job demands; that Peerless did not follow the four steps of progressive discipline contained outlined in the employee handbook; and that Peerless failed to hire and maintain a racially diverse workforce, does not permit a reasonable inference that discriminatory

animus also played a role in the decision. *Cf. Machinchick*, 398 F.3d at 353–55 (finding that evidence that an employer sought to hire younger employees, made stereotypical remarks about the plaintiff based on his age, treated similarly situated younger employees differently, and questioned the plaintiff about when he planned to retire, raised a fact issue as to whether the plaintiff's age was a motivating factor in his dismissal).[7]

## IV. Conclusion

Taylor has failed to raise a genuine issue of material fact as to whether Peerless's stated reason for his termination—that he had neglected to comply with management's directives concerning how he was to perform his job and that this was causing him to be ineffective in the field—was false and a pretext for discrimination, or as to whether Peerless's stated reason for his termination was only one reason for Peerless's decision to fire Taylor, and that Taylor's race was a motivating factor in the decision. Accordingly, the judgment of the district court is AFFIRMED.

---

[7]In light of our holding that Taylor has failed to raise a fact issue as to whether race was a motivating factor in his termination, we need not address the district court's holding that Peerless would have made the decision to fire Taylor regardless of discriminatory animus.