**REVISED August 10, 2018**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-20536

United States Court of Appeals
Fifth Circuit

**FILED**
August 9, 2018

Lyle W. Cayce
Clerk

EPHREM EYOB,

      Plaintiff - Appellant

v.

MITSUBISHI CATERPILLAR FORKLIFT AMERICA, INCORPORATED,

      Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-1688

Before KING, SOUTHWICK, and HO, Circuit Judges.

PER CURIAM:*

    Ephrem Eyob sued his former employer, Mitsubishi Caterpillar Forklift America, Inc. ("MCFA"), alleging that MCFA created a hostile work environment and terminated him based on his race, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20536

The district court granted summary judgment in favor of MCFA. Because there is no genuine issue of material fact on these claims, we affirm.

## I.

Eyob began work at MCFA in 2000. Over time, he was promoted to Crew Leader, and then to Plant Supervisor. In 2013, Eyob became the supervisor of Main Line 1 at MCFA's Houston facility. He was responsible for supervising over 50 employees who manufactured forklifts. Around the same time, Eyob began reporting directly to Marvin Chasteen.

In late 2013, a significant quality-control issue arose with respect to a hydraulic lever on the forklifts being produced by Main Line 1. This was particularly problematic because repairing the lever required MCFA's customers to remove the affected forklifts from service. MCFA received so many customer complaints that it placed all forklift production on hold so it could rework the defective forklifts in-house.

But that was not the end of the issue. In April 2014, customer complaints indicated that the hydraulic lever quality-control issue was occurring again. An investigation revealed that Main Line 1—Eyob's line—was responsible for a substantial number of the defective levers.

Chasteen consulted with his supervisor shortly after becoming aware of the second quality-control issue, and together they decided to terminate Eyob. Chasteen terminated Eyob without issuing him any warnings under MCFA's progressive discipline policy. As MCFA points out, however, its policies also provide that MCFA can terminate an employee without notice. Here, MCFA explained that Eyob was terminated because of his poor job performance—in particular (although not exclusively) due to the major and recurring quality-control issues that plagued Main Line 1.

Eyob subsequently filed suit in the Southern District of Texas, alleging that MFCA created a hostile work environment and terminated him based on

No. 17-20536

his race.  The district court granted summary judgment in favor of MCFA, and Eyob appealed.

## II.

We review an appeal from the grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Id.*

## III.

Title VII prohibits an employer from "discharg[ing] any individual . . . because of such individual's race, color, religion, or national origin."  42 U.S.C. § 2000e–2(a).  *See also Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999) ("Employment discrimination claims brought under 42 U.S.C. § 1981 . . . are analyzed under the evidentiary framework applicable to claims arising under Title VII.").  The parties agree that the district court correctly analyzed Eyob's claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, because Eyob presents only circumstantial evidence of his discrimination claim.  411 U.S. 792, 802 (1973).  *See also McCoy*, 492 F.3d at 556.

The parties agree that Eyob made out a prima facie case of unlawful discrimination and that MCFA offered a legitimate, nondiscriminatory reason for firing him—namely his poor work performance, as demonstrated by Main Line 1's repeated quality-control problems.  2017 WL 3215171, at *4. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) ("Poor work performance is a legitimate, non-discriminatory reason for discharge.").  Because the record was fully developed in connection with MCFA's summary judgment motion, we address directly whether Eyob has presented a genuine issue for trial on the ultimate question of discrimination *vel non*.  *U.S. Postal*

No. 17-20536

*Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("The 'factual inquiry' in a Title VII case is 'whether the defendant intentionally discriminated against the plaintiff.'").

Although Eyob "does not dispute that there were quality issues with the production lines," 2017 WL 3215171, at *4, he contends that MCFA's explanation for his termination—his poor work performance—was a pretext for unlawful race discrimination. We conclude that none of Eyob's four arguments raise a reasonable inference that race was a determinative factor in his termination.

A.

First, Eyob contends that the decision to dismiss him based on performance was pretextual. He argues the production defects were not his fault because they were caused by an engineering problem and he is not an engineer. But as the district court found, "MCFA produced evidence that the quality issues with the hydraulic levers originated from Eyob's line" and Eyob's challenge to that evidence was only "a conclusory allegation" because "Eyob does not support it with any evidence." 2017 WL 3215171, at *5.

Were that not enough, Eyob was aware that he was responsible for quality control: as he conceded, "Chasteen addressed quality issues [with him] during the year leading up to his termination." 2017 WL 3215171, at *4. This is confirmed by Eyob's job description and his performance reviews. The former made clear that he was responsible for making "customer satisfaction and quality control a major priority," and that the "essential functions" of his job required him to "ensure quality products are produced" and to "make[] recommendations for process/equipment changes to make improvements." His performance reviews evaluated him for quality control, an area in which Eyob repeatedly received deficient scores. One evaluation explained that his "Quality Focus scores have been very low." A subsequent review explained

4

that Eyob "still needs a lot of improvement" because his scores "are still not at the level that we must produce," "the quality is still very low," and there "are entirely too many major defects produced." That review also noted that the "Quality Audit Line #1 goal [was] 90%" but that this "actual [performance was] 78%."

At the end of the day, Eyob does not dispute that there "were quality issues in production lines" and that MCFA believed "that Eyob was responsible for those issues." Thus, even had he created a genuine dispute regarding who was responsible for the defects, MCFA still would be entitled to summary judgment. *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("[A] dispute in the evidence concerning [employee's] job performance does not provide a sufficient basis for a reasonable factfinder to infer that [employer's] proffered justification is unworthy of credence."). As we have explained, "it is not our place to second-guess the business decisions of an employer, so long as those decisions are not the result of discrimination." *Jackson v. Watkins*, 619 F.3d 463, 468 n.5 (5th Cir. 2010).[1] *See also Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006) (internal citation omitted) ("While [employee] may have some concerns about [employer's] management style, he does not have a Title VII claim. . . . '[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'").

---

[1] *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999) ("We have previously emphasized that 'discrimination laws [are not] vehicles for judicial second-guessing of business decisions.'") (alteration in original); *Little*, 924 F.2d at 97 ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.").

No. 17-20536

B.

Second, Eyob contends that MCFA's failure to follow its non-mandatory progressive discipline policy establishes pretext.  Eyob is correct that when "an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to an inference of pretext."  *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).  He is also correct that the non-mandatory nature of a policy does "not eliminate the inference of pretext raised by [the] failure to follow an internal company policy specifically stating that it should be 'followed in most circumstances.'"  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 n.29 (5th Cir. 2005).

But, as the district court explained, "there is no evidence that MCFA diverged from its discipline policies" because its policies "repeatedly include language explaining that MCFA may bypass any portion of the progressive discipline policy and terminate the employee for a single infraction or an accumulation of incidents that were not subject to progressive discipline." 2017 WL 3215171, at *7.  *See also Taylor v. Peerless Indus. Inc.*, 322 F. App'x 355, 3667 (5th Cir. 2009) ("Peerless did not violate the written disciplinary policy by declining to follow the four steps of progressive discipline listed in the policy; the policy clearly states that following the steps is not mandatory and that managers maintain significant discretion in determining how to discipline employees.").

Even if Eyob had created a fact dispute as to whether MCFA's failure to use progressive discipline constituted a failure to follow its disciplinary system, MCFA still would be entitled to summary judgment.  Unlike the progressive discipline policy in *Machinchick*—which "specifically stat[ed] that it should be 'followed in most circumstances,'" 398 F.3d at 354 n.29—MCFA's policy merely provided that although "MCFA believes in a process of progressive disciplinary action," there was no "guarantee that MCFA will always take progressive

6

disciplinary action." "Instead," the policy continued, "the company will investigate and attempt to judge what is fair and reasonable in each disciplinary case, given the facts unique to that case." "When an employee's performance is unsatisfactory," the policy explained "appropriate disciplinary action may be taken, up to an including termination of employment, without prior warning or notice." *See Taylor*, 322 F. App'x at 367 ("Unlike the policy in *Machinchick*, the policy in this case . . . emphasize[s] that the disciplinary measures used in a particular case will be highly dependent on the specific circumstances."); *Bugos v. Ricoh Corp.*, 2008 WL 3876548, at *5 (5th Cir. Aug. 21, 2008) ("Ricoh's policy simply did not require progressive discipline leading up to termination. Rather, Ricoh's policy, though it provided generally for progressive discipline, stated that '[e]ach individual situation must be considered on its own merits to determine the appropriate measures to be taken, including under certain circumstances, termination without prior notice.'").

Further, "Eyob offers no evidence and makes no arguments that MCFA's progressive discipline policy was exercised for the other plant supervisors, but bypassed only in his case." 2017 WL 3215171, at *7. Indeed, the evidence here actually showed that other employees *had* been terminated without resort to the optional progressive discipline policy, and that MCFA managers—including Eyob himself—often simply used verbal warnings rather than the formal progressive discipline policy. Finally, "unlike in *Manchinchick* [sic], Eyob does not offer sufficient additional evidence of his good performance to rebut MCFA's evidence of poor performance." 2017 WL 3215171, at *7.

Accordingly, absent "any evidence that [MCFA] generally followed the . . . steps outlined in its disciplinary policy, or that the policy was applied differently to similarly situated employees," we conclude that "the fact that [MCFA] did not follow the [ ] steps does not provide any relevant information

regarding whether race played a role in [Eyob's] termination." *Taylor*, 322 F. App'x at 367.

### C.

Third, Eyob argues that he demonstrated pretext by pointing to two similarly situated plant supervisors who were not terminated even though their production lines suffered similar quality control problems. Specifically, Eyob contends that Jimmy Uy (an Asian male) and Chip Hilgert (a white male) both obtained similar performance evaluations but were not terminated.

But as the district court recognized, we have defined similarly situated employees narrowly in this context. "[A]n employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). *See also Perez v. Tex. Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004) ("[F]or employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"). Nearly identical circumstances exist "where the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee*, 574 F.3d at 260. And most importantly, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.*

Neither Uy nor Hilgert falls within this definition. Although Eyob, Uy, and Hilgert each had the same job title, they oversaw different production lines, which performed different functions and entailed different performance expectations. 2017 WL 3215171, at *8. For example, Uy's line was responsible for finishing details of the forklifts, rather than mechanically assembling them

like Eyob's line. This difference renders incomparable both the rate and magnitude of errors arising from the two lines. 2017 WL 3215171, at *8 ("quality defects from Uy's line are not as serious as those from a mechanical assembly line such as Eyob's"). Likewise, Hilgert's line produced different, larger forklifts on a line with far fewer employees. Hilgert's line did have quality control issues but, unlike in Eyob's case, those issues arose at a time when Hilgert's employees were new and still in their training period. In addition, Hilgert was able to resolve the issue—and his subsequent performance evaluations show an improvement in his quality control score. 2017 WL 3215171, at *8. And it bears mention that, like Hilgert, Eyob was not terminated the first time production issues arose on his line—Eyob was terminated only after the issue occurred a second time.

In short, MCFA's treatment of Uy and Hilgert cannot support an inference of pretext because neither is similarly situated to Eyob.

D.

Finally, Eyob asserts that certain racially charged actions and comments made by his supervisor, Chasteen, demonstrate racial animus sufficient to establish pretext. 2017 WL 3215171, at *8–10. The evidence marshalled by Eyob is troubling if true, and Chasteen disputes much of it. At this stage in the proceedings, we interpret that evidence in the light most favorable to Eyob.

Racially offensive comments may constitute evidence of discrimination when they are "(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Manaway v. Med. Ctr. of Se. Tex.*, 430 F. App'x 317, 323 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010)). There is no dispute that (1) and (3)

are satisfied. But Eyob concedes that "no derogatory language or racial comments were directed at him, except for the comments regarding Barack Obama." 2017 WL 3215171, at *9. And, as the district court correctly concluded, the comments and actions relied on by Eyob to demonstrate "racial animus are not in temporal proximity to Eyob's termination and are vague." 2017 WL 3215171, at *10. Thus, they do not support a reasonable inference of pretext. *See*, *e.g.*, *Jackson*, 602 F.3d at 380 (offensive comment not evidence of discrimination where employee "provided no evidence that the comment was proximate in time to his firing or related to the employment decision at issue"); *Manaway*, 430 F. App'x at 323 (comment "made one year prior to [employee's] termination and . . . not made in the context of [the] decision to terminate [plaintiff] . . . does not demonstrate that [employee's] termination was the result of racial discrimination").

\* \* \*

Eyob concedes that MCFA's proffered reason for firing him—his poor work performance—is legitimate and non-discriminatory. He contends that he should not be blamed for the quality-control issue and MFCA should have given him more warnings before firing him. But rightly or wrongly, the "employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Riser*, 458 F.3d at 821. Eyob points to two other line supervisors who were not fired, but he fails to establish that he was similarly situated to them. And he puts forth some evidence that his employer made racist comments, but fails to connect those comments to his firing—either temporally or substantively. At the end of the day, MCFA is entitled to summary judgment because Eyob failed to create a

No. 17-20536

genuine fact issue regarding whether MCFA intentionally discriminated against him[2]

## IV.

The judgment of the district court is **AFFIRMED**.

---

[2] The district court rejected Eyob's hostile work environment claim on the ground that "Eyob failed to demonstrate that the terms, conditions, or privileges of [his] employment [were] affected by the alleged harassment."  2017 WL 3215171, at \*12.  *See also EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) ("To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action.").

The single, two-sentence-long paragraph of Eyob's brief that is dedicated to his hostile work environment claim is devoid of citations to the record, case law, or any other authorities. Nor does Eyob give any hint as to why he believes the district court erred on this claim.  Thus, Eyob has abandoned his hostile work environment claim by failing to brief it adequately. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim."); *Dardar v. Lafourche Realty Co.*, 985 F.2d 824, 831 (5th Cir. 1993) ("Questions posed for appellate review but inadequately briefed are considered abandoned.").