# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 30, 2009

Charles R. Fulbruge III
Clerk

No. 08-30444

MARCUS LEE

Plaintiff - Appellant

v.

KANSAS CITY SOUTHERN RAILWAY CO

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge, and WIENER and BENAVIDES, Circuit Judges.

JACQUES L. WIENER, JR., Circuit Judge:

Plaintiff-Appellant Marcus Lee, who is African-American, was an engineer for Defendant-Appellee Kansas City Southern Railway Co. ("KCS") from 1993 until his employment was terminated in 2004 after he failed to observe and obey a stop signal, thereby failing to stop the train he was operating in a Shreveport, Louisiana railyard. Lee sued KCS, alleging (1) race-based employment discrimination in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981, and (2) retaliatory discharge for (a) his prior filing of complaints with the Equal Employment Opportunity Commission ("EEOC") or (b) his numerous absences under the Family and Medical Leave Act ("FMLA"), or both.

In support of his claim of racially motivated employment discrimination, Lee identified several other KCS employees who he contends were similarly situated to him but were treated differently because they are white. The district court determined that these comparators were not similarly situated to Lee and granted summary judgment in favor of KCS, holding that Lee failed to establish a *prima facie* case of employment discrimination. Convinced that Lee identified at least one appropriate comparator, by virtue of which he established a *prima facie* case, we reverse the district court's judgment on Lee's Title VII claim, but affirm the remainder of the court's summary judgment in favor of KCS, dismissing the rest of Lee's claims.

## I. FACTS AND PROCEEDINGS

### A. Factual Background

Lee was an engineer for KCS for nine years until he was fired in September 2004[1] following an incident that occurred that month while Lee was operating a train in a railyard in Shreveport near the railroad bridge over the Red River. He was attempting to move his train forward on one track and then back the train onto a second track. After Lee pulled the train forward, the conductor with whom Lee was working indicated that he should proceed to reverse the train as planned. Neither Lee nor the conductor could see a red "block signal" which was indicating that Lee's train must stop because there were trains parked on the second track. After receiving the conductor's instruction but before backing up the train, Lee should have radioed his

---

[1] Lee, a member of the Brotherhood of Locomotive Engineers, joined KCS in 1993 as a brakeman and was promoted to locomotive engineer in 1995. An engineer is in charge of operating the train. When moving trains between tracks in a railyard — as was the situation when Lee committed the final infraction among those for which he was fired — the engineer works with a conductor, who is on the ground giving the engineer instructions, and communicates via radio with a dispatcher, who authorizes each of the train's movements.

dispatcher to receive the all-clear to reverse.[2] Lee failed to do so and ran through the signal.

Lee's conduct compounded two errors (the "Shreveport violations"): (1) failing to stop at the red block signal, and (2) failing to radio his dispatcher for permission to enter on to the second track. Although no damage or injury resulted from Lee's errors, KCS considers them to be among the most serious type of moving violations for which termination may be appropriate. Following the incident and the completion of an investigation, Lee's supervisor, Mark Redd, followed KCS's appealable disciplinary policy by, *inter alia*, reviewing Lee's record of violations for the preceding three years. Redd determined that not only were the Shreveport violations grave, but that they were even more troubling because they occurred just six months after another serious offense for which Lee had been given a 30-day suspension. In that instance, Lee had failed to slow to 10 miles per hour as required when passing a "yellow board" signal. These two serious violations in rapid succession, together with previous incidents of misconduct, including another moving violation only eighteen months earlier, persuaded Redd to fire Lee. Kathy Alexander, the railroad's director of labor relations, had final authority to grant leniency following Redd's decision to fire Lee, but she concluded that none was merited.

Lee exercised his right under his union's collective bargaining agreement to appeal the decision. This procedure culminated in a hearing before the Public Law Board (the "PLB"), which found Lee's firing appropriate.[3] Lee later sought to have the Federal Railroad Administration ("FRA") reinstate his engineer's

---

[2] KCS likened this to an airplane pilot radioing air traffic control prior to entering a runway.

[3] A PLB is a creature of federal law which investigates adverse employment actions against railroad employees covered by a collective bargaining agreement. It comprises three members, one representing the union, one representing the railroad, and one member who is independent. Its decisions are final and binding.

license so that he could work elsewhere. The FRA conducted its own investigation of the Shreveport violations, determining that under the circumstances Lee could not have seen the block signal and had to rely on his conductor who also could not see the block signal, a fact of which Lee was unaware at the time of the incident. The FRA concluded that these circumstances mitigated Lee's error and reinstated his license.

Lee filed an EEOC complaint following the termination of his employment by KCS, but it was dismissed by the EEOC. He had previously filed an EEOC complaint in 2003 in connection with an unrelated incident, during which another KCS employee had pulled a knife on him, an attack that Lee believed was racially motivated. The resolution of that prior complaint was the subject of some debate in the district court and is unclear to us from the record. It is apparent, however, that as a general rule, KCS managers were made aware when employees they supervise file EEOC claims.

Additionally, over the course of his employment with KCS, Lee regularly requested and received time off under the FMLA. Lee's wife suffered from migraine headaches and his child had chronic asthma, requiring him to be at home intermittently to care for them, including for 57 days in 2003. KCS kept records of employees' FMLA use and required that employees fully deplete their vacation and sick days before seeking leave pursuant to the FMLA. Alexander noted in her records that many of Lee's FMLA requests were for days immediately preceding or following weekends or holidays.

## B. Proceedings

Lee filed this suit in November 2005, contending that KCS would have offered him leniency, *viz.*, he would not have been fired or, if fired, he would have been reinstated, but for, e.g., his race, his use of FMLA, or the two complaints that he filed with the EEOC. Through discovery, Lee sought to identify KCS's treatment of other engineers with violations and safety records similar to his

own as proof that he was treated discriminatorily because of his race. Lee urged that the evidence of KCS's disparate treatment of more than a half-dozen comparators supports his claim.

Following KCS's motion for summary judgment, the district court focused on two of Lee's proffered comparators. It concluded that neither was similarly situated to Lee and therefore offered no support for his claim of disparate treatment based on race. The court ruled that Lee had failed to make out a *prima facie* case of racial discrimination in violation of Title VII and that Lee had adduced no evidence to support the existence of a causal connection between his firing and either his use of the FMLA or his filing of EEOC complaints. Following the district court's grant of KCS's motion for summary judgment, Lee timely filed a notice of appeal.

## II. STANDARD OF REVIEW

We review the grant of a motion for summary judgment *de novo*.[4] A grant of summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[5] In particular, we here consider whether Lee raised a genuine factual issue as to his *prima facie* case of racially motivated employment discrimination.[6]

## III. ANALYSIS

Lee advances three contentions in this appeal. He asserts principally that but for his race, he would not have been fired following the Shreveport

---

[4] *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 447 (5th Cir. 1996) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 65 (5th Cir. 1993)).

[5] *Id.*; *see* FED. R. CIV. P. 56(c).

[6] *Culwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006); *see also Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 301 (5th Cir. 2000) (jury question exists when plaintiff has raised reasonable inference that race rather than the employer's proffered explanation motivated the employer to take adverse action against employee).

violations.[7]  He also contends that his firing was in retaliation for his use of the FMLA, and his filing of EEOC complaints.

## A. Retaliatory Discharge

Lee asserts that his EEOC claims influenced Redd's decision to fire him and that his numerous leave-takings under FMLA swayed Alexander's decision not to offer leniency.

### 1. EEOC Filings

There is no evidence in the record that Redd was even aware of Lee's EEOC filings.  Although Redd stated in his deposition that managers generally were made aware of employees' EEOC filings, Redd testified that he did not remember having any knowledge of Lee's having filed any such complaints.  Lee merely reasons that because of Redd's statement about managers' generalized knowledge of complaints and the fact that Redd had discussed Lee's potential firing with Alexander, Redd must have known about Lee's EEOC complaints and must have considered them when deciding that firing Lee was merited.  Lee offers only speculative inferences to support his assertion, which is insufficient to demonstrate the existence of a genuine issue of material fact.[8]

### 2. Use of FMLA Leave

Lee next contends that his frequent taking of leave under the FMLA landed him on a so-called "last supper" list of employees whose frequent absences flagged them as candidates for firing or at least for reprimand.  The FMLA not only requires employers to permit employees to take leave under the

---

[7] *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n.10, 96 S.Ct. 2574 (1976); *Jenkins v. State of La., Through Dep't of Corrs.*, 874 F.2d 992, 997 (5th Cir. 1989) (in employment discrimination suit, burden is on plaintiff to prove race was "but for" cause of adverse employment decision).

[8] *Michaels v. Avitech, Inc.*, 202 F.3d 746, 754-55 (5th Cir. 2000).

statutory framework, it prohibits employers from retaliating against employees for doing so.[9]

Although there is evidence in the record of the existence of such a "last supper" list, there is no evidence that Lee's name was on it. KCS did track employee leave — of all types — for payroll and employee record purposes, including to monitor its rule that employees use their vacation and sick time entirely prior to taking FMLA leave. Alexander stated that, in her capacity as KCS's liaison with the union, she recorded employee FMLA leave for those reasons, but that she gave no consideration to Lee's use of the FMLA when deciding whether to grant him leniency. She conceded that she had been suspicious of Lee's use of FMLA because it often coincided with holidays and weekends, but stated that she never pursued those suspicions and that, in any case, Lee had ceased taking FMLA leave nearly a year before the Shreveport violations. Lee offered no additional evidence that would create a genuine issue of material fact of a nexus between his use of FMLA leave and his firing. We affirm the district court's grant of summary judgment for KCS on this claim.

## B. Title VII Violation

As noted, Lee's principal complaint is that his firing by KCS was the result of racial discrimination, in violation of Title VII of the Civil Rights Act of 1964.[10] He insists that white employees were not fired, or that they received leniency in the form of reinstatement, for violations similar to his.

To establish a *prima facie* case of racial discrimination in employment, an employee must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his

---

[9] *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998).

[10] *See* 42 U.S.C. § 2000e-2(a).

membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.[11] Once an employee has made out a *prima facie* case, an inference of intentional discrimination is raised[12] and the burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action.[13] If the employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial bias.[14]

The first three elements of a *prima facie* case of race-based discrimination are not in dispute in this appeal; we consider only the fourth, as did the district court. Lee asserts that white KCS engineers with similar safety records were not fired despite similar violations of equal magnitude. Lee identified for the district court some half-dozen putative comparators. Only two, Greggory Bickham and James McClure,[15] are the focus of this appeal.

*1. "Similarly Situated"*

The question whether Lee presented a *prima facie* case of racial discrimination turns here on whether either or both of the white engineers

___

[11] *See, e.g.*, *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973) (establishing the burden-shifting framework and explaining that as the facts will vary from case to case, so too, will the specific *prima facie* proof required).

[12] *LaPierre v. Benson Nissan*, 86 F.3d 444, 448 (5th Cir. 1996).

[13] *McDonnell Douglas*, 411 U.S. at 802. Notwithstanding the burden-shifting explained in *McDonnell Douglas*, the burden of proof remains with the plaintiff throughout. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981).

[14] *Burdine*, 450 U.S. at 255-56.

[15] KCS refers to McClure as Charles McClure; both Lee and the district court refer to him as James McClure. We will refer to him as James McClure (or "McClure") to be consistent with the district court.

identified by Lee as comparators were similarly situated to him. If Lee established this fourth element of his *prima facie* discrimination case, the burden shifts to KCS to demonstrate that it had a legitimate nondiscriminatory reason for taking the adverse action against Lee.[16] We have considered the requirement for one employee to be similarly situated to another on any number of occasions. Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.[17] Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated.[18] This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken "under nearly identical circumstances."[19] The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities,[20] shared the same supervisor or had their employment status determined by the same person,[21] and have essentially comparable violation histories.[22] And, critically, the plaintiff's

---

[16] *McDonnell Douglas*, 411 U.S. at 802.

[17] *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (considering sufficiency of evidence sustaining jury verdict).

[18] *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990).

[19] *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991) (internal quotation marks omitted).

[20] *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221-22 (5th Cir. 2001).

[21] *Barnes v. Yellow Freight Sys., Inc.*, 778 F.2d 1096, 1101 (5th Cir. 1985).

[22] *Okoye v. Univ. of Tex. Houston Health Sci.*, 245 F.3d 507, 514 (5th Cir. 2001).

conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions.[23] If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.[24]

We do not, however, interpret "nearly identical" as synonymous with "identical."[25] Applied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical.[26] For example, it is sufficient that the ultimate decisionmaker

---

[23] *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004); *see*, *e.g.*, *Bouie v. Equistar Chems. LP*, 188 F. App'x 233, 237 (5th Cir. 2006) (unpublished) (per curiam) (plaintiff discharged for violating two safety protocols could not use comparator who only violated one safety protocol); *Dodge v. Hertz Corp.*, 124 F. App'x 242, 244 (5th Cir. 2005) (unpublished) (per curiam) (that plaintiff's and proffered comparator's acts were both "dishonest" is insufficient to make misconduct nearly identical); *Trotter v. BPB Am., Inc.*, 106 F. App'x 272, 276-77 (5th Cir. 2004) (unpublished) (per curiam) (misconduct of employees who fought with other employees was not nearly identical to plaintiff, who fought with union president). We note that unpublished cases are not precedential in this court except for the limited reasons stated in our 5TH CIR. R. 47.5. We cite them here only to demonstrate the consistency of our jurisprudence.

[24] *Wallace*, 271 F.3d at 221 (emphasis added).

[25] Lee perceives tension in our case law between the "nearly identical" standard in *Perez* and the "comparable seriousness" standard explicated by the Supreme Court in *McDonald v. Santa Fe Trail Transportation Co.* 427 U.S. 273, 283 n.11, 96 S.Ct. 2574 (1976) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817 (1973)). We emphasize today that this Circuit's "nearly identical" standard is not equivalent to "identical." Furthermore, in this case, we focus on the totality of the circumstances of Lee's employment as compared with Bickham's; the similitude of their ultimate infractions — on which *Perez* turned — is not our focus, as they were essentially the same, i.e., failing to obey a stop signal. *Perez*, 395 F.3d at 214.

[26] When we have found employees not to be similarly situated, the cases have presented marked distinctions between the employees, not the marginal differences at issue here. *See*,

as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor. Each employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable.[27] As the Supreme Court has instructed, the similitude of employee violations may turn on the "comparable seriousness" of the offenses for which discipline was meted out[28] and not necessarily on how a company codes an infraction under its rules and regulations. Otherwise, an employer could avoid liability for discriminatory practices simply by coding one employee's violation differently from another's.

*2. Comparators*

In this case, the district court determined that Lee did not satisfy his initial burden of establishing a *prima facie* case because he did not demonstrate that he had been treated disparately from any other *similarly situated* KCS engineer. When we apply the foregoing factors to Lee's proffered comparators, McClure and Bickham, we find that we are in partial disagreement with the district court. With respect to McClure, who was fired for dishonesty and misuse of company property, we agree that his offenses and his employment history are too dissimilar to those for which Lee was fired to render him similarly situated to Lee. With respect to Bickham, however, we hold that he is an appropriate comparator.

---

*e.g.*, *Amezquita v. Beneficial Tex., Inc.*, 264 F. App'x 379, 385-86 (5th Cir. 2008) (unpublished) (per curiam) (plaintiff, who was fired for lying, was not similarly situated to her supervisor who was demoted for poor managerial performance); *McKinney v. JB Hunt Transp. Inc.*, 193 F. App'x 373, 374 (5th Cir. 2006) (unpublished) (per curiam) (plaintiff had numerous complaints against her and instances of unprofessional conduct unlike her proffered comparator).

[27] The relevant perspective is that of the employer at the time of the adverse employment decision. *Perez*, 395 F.3d at 210.

[28] *McDonald v. Santa Fe Trail*, 427 U.S. at 283 n.11 (quoting *McDonnell Douglas*, 411 U.S. at 804).

Lee was fired for (1) disregarding a block signal that indicated he had to stop the train and (2) failing to contact his dispatcher for authorization to proceed. Six months prior to his firing, Lee had committed another moving violation — failing to slow his train in compliance with a signal — for which he received a 30-day suspension. And, eighteen months earlier, Lee had committed yet another moving violation for which he had received a five-day suspension. On this record, Redd decided to fire Lee, and, crucially, Alexander decided not to grant Lee leniency, which, if granted, would have led to his reinstatement.

Also in late 2004, Bickham had failed to halt his train at a stop signal; yet, even though he was fired, Alexander granted him leniency and reinstated him. Bickham had committed a like number of moving violations as had Lee. During the same period over which Lee's previous violations were accumulated, Bickham had (1) failed to inspect a train in compliance with a trackside warning signal, for which he received a 30-day suspension; (2) improperly handled a train that separated as a result, for which he received a 5-day suspension; and (3) occupied a main track without authority, for which he was fired, only to be reinstated by Alexander. We are satisfied that employment histories marked by a comparable number of serious moving violations by train engineers who perform the same job are sufficiently similar to require comparison of the two when, as here, the final violations — failing to obey a stop signal — are indistinguishable.

KCS points to a host of distinctions between Bickham's situation and Lee's: Bickham did not have a similarly serious infraction just six months before his failure to stop as did Lee; Bickham's failure to stop was excused by foggy conditions and took place in a rural area where potential damage to persons and property was minimal; Bickham and Lee had different supervisors, and it was those different supervisors who made the decisions to fire these engineers. We are not persuaded that these distinctions add up to a difference, at least not one

sufficient to eschew comparison. Alexander stated that she reviewed an employee's entire history with the company, not merely the previous six months. Redd stated that he reviewed Lee's record going back three years, and Bickham's violations over this longer period are equally grave and similar in number. KCS would emphasize the comparison of the preceding six-month periods to distance Bickham from Lee, but that was not the only period considered at the time the firing and leniency decisions were made. Further, just as Bickham's vision was obscured by fog, Lee, too, could not see the signal that he failed to obey. And, although KCS tries to make much of the fact that Lee's infraction took place in downtown Shreveport rather than in a rural setting as did Bickham's, we note that the Lee incident occurred inside a railyard, not out on the city streets where members of the general public might have been endangered directly. Finally, although these two men had different supervisors, Alexander oversaw leniency, which Bickham received and Lee did not, so the ultimate decisionmaker on rehiring after firing was the same person for both engineers.

On this analysis, we conclude that Lee and Bickham are similarly situated making Bickham a proper comparator whom the district court nevertheless rejected. They held identical positions at KCS, compiled a similar number of serious moving violations over a similar period of time, including an identical infraction for which Lee was fired and Bickham was granted leniency, and their ultimate employment status rested with the same person. We should not be understood to say that the distinctions noted by KCS are not relevant; indeed they might very well prove to be relevant in the event that KCS proffers a legitimate nondiscriminatory explanation for the disparate results in Lee's and Bickham's cases. But our sole task today is to determine whether Lee satisfied his burden of establishing a *prima facie* case; and we hold that, by validly identifying Bickham as a comparator, he has.

## IV. CONCLUSION

As we conclude that Bickham is a satisfactory comparator, we hold that Lee established a *prima facie* case of Title VII racial discrimination. We therefore REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion. We AFFIRM the remainder of that court's summary judgment, dismissing Lee's FMLA and EEOC retaliation claims.