# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 17, 2013

No. 13-60250
Summary Calendar

Lyle W. Cayce
Clerk

BERENICE GREENLAW DEANES,

Plaintiff–Appellant,

versus

NORTH MISSISSIPPI STATE HOSPITAL,

Defendant–Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi
No. 1:11-CV-198

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Berenice Deanes appeals a summary judgment in her race-discrimination suit. Finding no error, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-60250

Deanes, a black female, was a nurse at North Mississippi State Hospital ("NMSH") for about a year until a 2009 incident with Jane Doe,[1] a nineteen-year-old psychiatric patient, ultimately resulted in her termination.

Deanes's account of the incident, which we take as true for purposes of this appeal, is as follows: Another nurse told her that Doe had not taken her medications, so Deanes attempted to get Doe to take them, but Doe refused. Doe started using profanity, "g[o]t loud," and grabbed Deanes by her arms and tried to pull Deanes to the floor. Deanes put her arms on Doe's and began "walking" her backward toward a couch. At her deposition, Deanes describes what followed:

> At the time I remember taking my arms and putting them on top of my hands and putting them on top of her hands. And she was pulling me all the same time. And there was a struggle because she was struggling. She was using all her force to try and get me down. And so I remembered us getting to the couch . . . . When she sat down on the couch, she released me[,] and I fell backwards from the couch.[²]

The only witness aside from Deanes and Doe was Kerry Whitten, a campus police officer. He observed some portion of the incident on a video monitor, but exactly what he saw is disputed. Drawing all inferences in favor of Deanes, all Whitten saw was Doe "hitting the couch and [Deanes] standing in front of her," at which point he rushed to the scene.

While Whitten was en route, Doe had gotten up from the couch, and Deanes had a second physical altercation with Doe: Deanes stood with her arms out, "elbows locked," fingers pointed upward, and asked Doe to respect her personal space. Doe then "ran into Deanes' extended arms and stumbled back-

---

[1] We use this moniker to protect the patient's medical privacy.

[2] This version was a noticeably different version from what Deanes provided in her pre-suit EEOC statement, but we accept as true the version Deanes provided under oath in her deposition.

ward" but remained standing. It appears that this second instance of physical contact was consistent with techniques taught by NMSH to manage aggressive behavior by patients.

The Department of Mental Health ("DMH") Addendum to the Mississippi State Employee Handbook requires the following:

> Any employee witnessing or having suspicion of any mistreatment, violence, threat, neglect, exploitation, physical abuse, sexual abuse, or verbal abuse must report the incident immediately . . . . Failure to report the proper authorities is considered a Group III offense.

Consistent with the Addendum, Whitten told the nurse in charge, Kathy Gilmore, that he saw Deanes push Doe down on to the couch. Gilmore, in turn, contacted Jan Botts, a Nurse Executive (who had hired Deanes), and relayed what Whitten had told her. Botts then called David Ledbetter, the hospital's director of risk management, who subsequently initiated an investigation into whether Deanes had abused a patient as defined by the Employee Handbook, which states:

> Under no circumstances will an employee strike, shove, pinch, engage in sexual acts, neglect[,] or otherwise subject any consumer to violent treatment, verbal abuse[,] or exploitation.

> Consumer abuse and neglect are very serious offenses and will result in immediate removal from the workplace or termination. Further, such actions will lead to prosecution to the fullest extent of the law.

The incident with Doe took place on June 21. On June 22 and 23, Ledbetter interviewed and obtained statements from Whitten, Gilmore, Doe, and other employees who were present. He could not obtain a statement from Deanes because she was out of town attending a seminar, but Deanes prepared a written statement on June 24. By then, Ledbetter had completed his investigation and prepared a report.

No. 13-60250

In Gilmore's written statement, she said that after the incident, Whitten told her that he saw Deanes push Doe down onto the couch "pretty hard." Whitten, in his written statement, did not state that he actually saw a push but rather states, "I turned around and saw on the women's unit camera [Deanes] and [Doe]. [Deanes] has both hands up and the same time [Doe] was falling backwards on the couch." When Ledbetter asked Whitten about the discrepancy, Witten responded that "there was no question that the patient was pushed back," that he observed Deanes make "pushing motion," and "she put her hands up, she pushed out, the patient went back over the couch."

When pressed on this point in his deposition, Whitten made clear that he did not see the "push," only the "aftermath":

A:     No, I didn't actually see the push but I saw what [sic] the patient landed on the couch and [Deanes] Standing in front of her.

Q:     You have no idea whether or not—you have no idea what happened, what had occurred prior to—prior to seeing the patient falling on the couch, you have no idea what happened previous to that, do you?

A:     Nope

. . .

Q:     Did she push the patient in a violent manner?

A:     From the way she hit the couch that's what it looked like.

Q:     Could the patient have ran into her outstretched arms and fall backwards on her own momentum?

A:     I don't believe so, no.

Ledbetter's three-page investigative report summarized the statements and interviews and recounted Ledbetter's interview with Doe, who told him,

4

No. 13-60250

"I don't feel good because the nurse push[ed] me down on the couch Sunday night[,] and I hit my head on the wooden end." Ledbetter sent his report to Botts and Greg Sappington, the NMSH personnel officer.

Deanes then went on vacation starting June 25, returning to work on July 2, whereupon she was asked to attend a meeting with Botts and Sappington. She was given a pre-termination notice, which placed her on administrative leave pending a final determination. Botts—who had hired Deanes—recommended terminating Deanes based on the "investigative report and our handbook." Sappington testified that he did not "personally recommend" terminating Deanes, but "based on the evidence, [had] no choice but to probably terminate her based on our policy."

Deanes rejected an invitation to resign and instead filed a grievance asking for a formal termination hearing with Dr. Paul Callens, the Director of NMSH. Callens was the final decisionmaker as to Deanes's termination, and at the conclusion of a hearing he terminated Deanes. He testified that he based his decision on Whitten's and Doe's statements and that he did not believe Deanes's version of the events.

Several months later, Deanes filed a charge of discrimination with the EEOC, which determined that reasonable cause existed to believe she was discharged because of her race, so it issued a notice of right to sue. Deanes then sued, alleging that NMSH terminated her on the basis of race in violation of Title VII. The district court granted summary judgment in favor of NMSH. Because, as the district court correctly held, Deanes has failed to meet her burden of producing substantial evidence indicating that NMSH's proffered non-discriminatory reason for her termination is pretextual, we affirm.

I.

We review a summary judgment *de novo*, applying the same standards as

No. 13-60250

did the district court, which accurately stated the relevant standard for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). We must view the facts in the light most favorable to Deanes and draw all reasonable inferences in her favor. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

## II.

It is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). As the district court correctly pointed out, because Deanes attempts to prove her case circumstantially, we apply the framework explained in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): Deanes must first establish a *prima facie* case of discrimination by establishing that (1) she was a member of a protected group; (2) she was qualified for the position she held; (3) she suffered an adverse employment decision; and (4) she was replaced by someone outside her protected group. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001) (citations omitted).

No. 13-60250

The district court was correct to conclude that Deanes has made a *prima facie* case, so NMSH bore the burden of producing a nondiscriminatory reason for terminating her. That burden, though, is one of production, not persuasion. *Parker v. State of La. Dep't of Educ. Special Sch. Dist.*, 323 F. App'x 321, 237 (5th Cir. 2009). Again, the district court was correct that NMSH plainly met that burden by asserting that it terminated Deanes for patient abuse.

Because NMSH has articulated a reason that, if believed, would support a finding that the action was nondiscriminatory, the inference of discrimination created by Deanes's *prima facie* case disappears, and she is left with the ultimate burden of proving intentional discrimination. This case turns, then, on whether she met her burden of producing "substantial evidence" that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.

III.

To demonstrate pretext, Deanes must do more than merely show that NMSH was mistaken in firing her, even by its own terms; she must establish that it fired her on account of race. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *Sandstad v. C.B. Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Pretext may be established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). On both fronts, Deanes fails to meet her burden.

A.

Deanes takes issue with NMSH's reliance on the "word of a mental patient" over Deanes in concluding that she had committed patient abuse. Yet, Doe's statement was consistent with that of Whitten, the only other witness.

Deanes then attacks Whitten's statement primarily by challenging that he did not really "see" the putative push.  Nevertheless, Ledbetter was surely entitled to conclude that what Whitten *did* see (the patient hitting the couch forcefully, Deanes standing above her) was consistent with Doe's statement that she had been pushed.  Most importantly, what Deanes described as happening (holding onto Doe's arms and "walking" Doe backward until she fell onto the couch) is consistent with Doe's being "pushed."  The fight here seems semantic.

Callens was presented with Ledbetter's investigative report, which contains statements from Whitten and Doe that Deanes had committed patient abuse by pushing Doe down onto the couch.  Deanes's attacks on Doe's and Whitten's statements amount to no more than disputing whom Ledbetter (and the others who recommended Deanes's termination) should have believed.  And "simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire*, 480 F.3d at 391; *see also Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).  We have affirmed summary judgment on similar facts.  *See Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).

Deanes also notes that NMSH did not "defer" to findings in the investigation by the State Board of Nursing, which had decided to "close[]" its investigation "without formal charges being filed *at this time*."  What Deanes failed to point out, and what renders her argument at least slightly misleading, is that the Board did not close its case until six months *after* NMSH had terminated Deans.  We cannot say that Deanes has presented "substantial evidence" that Callens's decision was based on anything but a good-faith belief that Deanes probably abused Doe.

B.

Before the district court, Deanes argued that similarly situated white

employees were treated more favorably. Deanes does not seem to press the argument with any gusto on appeal: The issue is alluded to as the tenth item in a bulleted list in her brief, and the discussion is more of an allusion than an argument. Nevertheless, the district court ably and carefully went through each of the instances of alleged disparate treatment. For almost every one of them, Deanes was prepared to offer only inadmissible hearsay, which she cannot use to defeat summary judgment.

There are two instances in which Deanes was able to produce admissible evidence, but as the district court correctly pointed out, they do not help Deanes meet her burden. Disparate treatment occurs where an employer treats one employee more harshly than other "similarly situated" employees for the "nearly identical" conduct. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). The "employee being compared must have 'held the same job or responsibilities, shared the same responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Brooks v. Lubbock Cnty. Hosp. Dist.*, 373 F. App'x 434, 436 (5th Cir. 2001) (quoting *Lee*, 574 F.3d at 260).

Deanes alleges that Suzy Gildea, a white female, was insubordinate (a Group II offense) and used profanity toward a patient (a Group I offense). Deanes does not allege that Gildea was not punished, but she complains that Gildea was only reprimanded and forced to write a letter of apology. These episodes (as well as her unkempt "overall appearance," and "not handl[ing] situations that come up in a professional manner," whatever that means), however, are not Group III offenses like patient abuse, nor are they sensibly "nearly identical" to patient abuse.

Deanes alleges that Dustin Carter, a white male, had a confrontation with a patient and elbowed him in the mouth, causing the patient's mouth to bleed, but Carter was not terminated. Yet, Deanes was the nurse on duty that day,

and her report does not mention Carter's hitting the patient; she checked "none" on the report regarding patient abuse. In her deposition, she even testified under oath, "I did not see it as patient abuse at that time." The district court was, therefore, correct that Deanes failed to identify any similarly situated white employees who were treated more favorably than she.

## C.

Because of Deanes's failure to identify any similarly situated white employee who was treated more favorably than she, there is no error in the district court's treatment of the EEOC's determination that reasonable cause existed to believe that Deanes was discharged based on her race. The court acknowledged, consistent with *Price v. Federal Express Corp.*, 283 F.3d 715 (5th Cir. 2002), the probative value of EEOC determinations, and so it did not "ignore the manpower and recesses expended on the EEOC investigation and the expertise acquired by" EEOC investigators, *Smith v. Universal Services, Inc.*, 454 F.2d 154, 158 (5th Cir. 1972). But it noted that the EEOC decision rested on the premise that there were similarly situated white employees who violated had NMSH policy. Because that premise was false, the district court discounted the EEOC determination accordingly.

Because the district court correctly determined that Deanes failed to meet her burden of producing substantial evidence to rebut NMSH's proffered race-neutral reason for firing her, the summary judgment is AFFIRMED.