## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60348

United States Court of Appeals
Fifth Circuit

**FILED**
March 8, 2018

Lyle W. Cayce
Clerk

ERICA MOORE,

      Plaintiff - Appellant

v.

UNIVERSITY MISSISSIPPI MEDICAL CENTER; JOHN DOES,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:16-CV-52

Before DAVIS, JONES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON:*

Erica Moore was terminated from her position as a billing specialist at the University of Mississippi Medical Center's School of Dentistry after she left departmental money sitting out on top of her desk when she left her office and $100 went missing. She sued the University of Mississippi Medical Center ("UMMC"), bringing claims for race discrimination in violation of Title VII and § 1981 as well as breach of contract. She alleged that, as an African-American

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-60348

woman, she was treated less favorably than a similarly situated white woman who was not terminated after she, too, left money unsecured that then went missing. The district court dismissed Moore's § 1981 and breach-of-contract claims as barred by the Eleventh Amendment and granted summary judgment in UMMC's favor on her Title VII claim, concluding that Moore had failed to establish that she and her purported comparator were similarly situated. We agree and affirm.

## I.

## A.

The following facts are not in dispute. Erica Moore ("Moore"), an African-American woman, began working for UMMC in 2007. She held several positions during her tenure there, including, as is relevant here, serving as a billing specialist for the school of dentistry for two years before her termination in 2014. As a billing specialist, Moore was responsible for counting and depositing the money collected from each department. Every evening, each department would leave its money with Moore's supervisor, Shavonda Greenfield, and every morning, Moore would collect the money from Greenfield, who kept it locked in a safe overnight, and take the money to her own office to count. Moore's office was secured by a keypad lock on the door. Additionally, her desk had a locking drawer and she had a lockbox in which she could secure the money while it was in her office. Moore had been trained to not leave money sitting out and unsecured if she left the area.

On October 20, 2014, Moore had the money that had been collected from the other departments on October 16 and 17. After counting the money and verifying that she had the full amounts, Moore took the money from the 16th to the front desk for the courier to pick up, leaving the money from the 17th out on her desk. Before returning to her office, she stopped to heat up her lunch. When she returned to her office after having been away for

2

approximately 10 minutes, she recounted the money from the 17th and discovered that $100 was missing. After looking unsuccessfully for the missing money, she e-mailed Greenfield to report it. Greenfield then reported the missing money to her supervisor, Stacy Brookerd. Brookerd reported the incident to the human resources ("HR") department. Rebecca Keefer-Rieves, the HR representative for the school of dentistry, instructed Brookerd to contact the campus police. Brookerd did, and the police investigated but were unable to determine who had taken the missing money. The police then turned the case back over to the UMMC HR department.

On November 12, 2014, Moore was suspended without pay pending the outcome of an HR investigation. During the investigation, Moore admitted that she had left the money unsecured on her desk when she left her office. Keefer-Rieves ultimately recommended to Barbara Smith Watson, the Director of Employee Relations, that Moore be terminated due to "inefficiency, negligence in the performance of duty or lack of attention to work," which the UMMC Faculty and Staff Handbook identified as grounds for employee disciplinary action up to and including discharge. Specifically, Keefer-Rieves cited Moore's failure to secure money before leaving her office as the basis for termination. On November 21, 2014, Keefer-Rieves wrote to Moore notifying her that it had been determined that Moore's actions violated UMMC policies and protocols and that her employment was therefore terminated.

**B.**

Stacy Moore ("Stacy"), a white woman, began working as a patient services coordinator in the Oral-Maxillfacial Surgical Department of the UMMC School of Dentistry in 2012. As a patient services coordinator, her duties included obtaining insurance and medical information from patients and collecting co-pays. She was the custodian of a petty cash fund, which is money given by UMMC directly to an employee for use in the course of their

No. 17-60348

employment and then returned to UMMC when that employee leaves his or her position. Stacy's supervisor, Laura Wells, had issued her a personal check from UMMC for $125. Stacy cashed the check and used the $125 to make change for patients who paid for services with cash. Because the check was issued to Stacy personally, she was responsible for replacing any money that went missing.

On September 24, 2014, Stacy reported to Wells that $95 of her petty cash was missing. Stacy had received the $125 check approximately three weeks before, and noticed the missing funds on the 23rd. The money was kept in a drawer accessible to others and was often left unsecured during business hours. The drawer was locked at the end of each day, but Stacy could not say whether the drawer had been locked at the end of the day on September 20—the last business day before the missing funds were discovered—because she had left early that day for a medical appointment. Wells reported the missing money to the UMMC police department. The police investigated but were unable to determine who had taken the money and sent the case back to UMMC. The matter was not referred to HR and no disciplinary action was taken.

### C.

On December 12, 2014, Erica Moore filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Moore a notice of right to sue, and she filed suit against UMMC on January 28, 2016.[1] The complaint alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

[1] The complaint also named the University of Mississippi and John Does as defendants. The University of Mississippi was later dismissed pursuant an agreement between the parties, and Moore never amended her complaint to identify the Doe defendants.

4

No. 17-60348

§ 2000e *et seq.*, race discrimination in violation of 42 U.S.C. § 1981,[2] and breach of contract.  In September 2016, the district court dismissed the § 1981 and breach-of-contract claims as barred by the Eleventh Amendment.  Then, in April 2017, the district court granted UMMC's motion for summary judgment on the Title VII claim.  Moore timely appealed, and now contends that the district court erred by dismissing and granting summary judgment on her claims.

## II.

## A.

Moore first contends that the district court erred by granting summary judgment on her Title VII claim.  We review a district court's grant of summary judgment de novo, applying the same standard as the district court and viewing the facts in the light most favorable to the non-moving party.  *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 406 (5th Cir. 2016).  "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

Moore argues that the district court erred by failing to view the evidence in the light most favorable to her and that, when so viewed, there are genuine issues of material fact as to whether UMMC treated her less favorably than another similarly situated employee.  We see no such genuine issues of material fact and affirm the district court's grant of summary judgment.

Under the familiar *McDonnell Douglas* burden-shifting framework, a Title VII plaintiff first bears the burden of establishing a *prima facie* case of discrimination.  *Id.* at 408 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[2] Moore's complaint alleged race discrimination under theories of both disparate treatment and disparate impact.  However, she has abandoned her disparate impact theory and proceeds on a theory of disparate treatment only.

792, 802–04 (1973)). If that burden is met, there is a presumption of discrimination and the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [adverse employment action]." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer satisfies that burden, "the presumption of discrimination 'drops out of the picture,'" and the burden then shifts back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination, *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)), or that her protected characteristic was a "motivating factor" for the employment decision, *id.* (quoting *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)).

To establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must show four things: (1) that she is a member of a protected class; (2) that she was qualified for the position at issue; (3) that she was the subject of an adverse employment action; and (4) that she was "treated less favorably because of [her] membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009). The first three elements are not in dispute here; the parties dispute only whether Moore established that a similarly situated non-minority employee was treated more favorably under nearly identical circumstances. Accordingly, the first issue in this appeal turns on whether Moore's chosen comparator—Stacy Moore—was in fact similarly situated to her.

A comparator will be considered "similarly situated" to the plaintiff if the two "held the same job responsibilities"; worked for "the same supervisor or had their employment status determined by the same person"; had "essentially comparable violation histories"; and "critically, [where] the plaintiff's conduct that drew the adverse employment decision [was] 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment

decisions." *Id.* at 260.  Employees who had different supervisors, worked for different divisions of a company, held different responsibilities, or who were the subjects of adverse employment actions that were either too remote in time from one another or the results of dissimilar violations will generally not be considered "similarly situated." *Id.* at 259–60.  At bottom, the plaintiff must be able to establish that "the employment actions at issue were taken 'under nearly identical circumstances.'" *Id.* at 260 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).  Of course, we do not read "'nearly identical' as synonymous with 'identical,'" as that would create an "essentially insurmountable" hurdle for Title VII plaintiffs.  *Id.*  Accordingly, our review cannot be too rigid, and the relevant differences must be more than "marginal." *See id.* at 260 n.26.  For example, "[a]s the Supreme Court has instructed, the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations." *Id.* at 261 (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).

Here, Moore failed to establish that she and Stacy were similarly situated.  First, the two held different positions with different job responsibilities.  *Id.* at 260–61 (stating that employees with different job responsibilities are not similarly situated).  Moore was a billing specialist, whose responsibilities included balancing daily accounts and preparing bank deposits.  Stacy was a patient services coordinator, whose responsibilities included various administrative tasks pertaining to patient intake or outpatient services, such as obtaining insurance information and collecting co-pays.  Second, the two had different supervisors and had their employment statuses determined by different people.  *See Lee*, 574 F.3d at 259 ("Employees with different supervisors . . . generally will not be deemed similarly

situated."); *Little*, 924 F.2d at 97 (holding that circumstances of two employees were not "nearly identical" where they had different supervisors). Moore was supervised by Greenfield, who in turn reported the missing money to her supervisor, Brookerd. Brookerd then referred the matter to HR, and Smith Watson, the Director of Employee Relations, made the ultimate decision to terminate Moore pursuant to the recommendation of Keefer-Rieves, the HR representative for the school of dentistry. Stacy was supervised by Wells, who concluded that Stacy's conduct had not violated any UMMC policy and thus did not refer the matter to HR. Smith Watson, who ultimately made the decision to terminate Moore, was not even aware of Stacy's missing petty cash until she received Moore's EEOC charge in this case.

Moore contends that, despite their different job responsibilities and supervisors, she and Stacy were similarly situated because they were treated differently for nearly identical conduct. She argues that she and Stacy were both custodians of UMMC funds; both lefts funds unattended that then came up short; and that she was terminated while no disciplinary action was taken against Stacy. However, as the district court concluded, the undisputed evidence is clear that Moore and Stacy were custodians of different categories of funds. And, as elaborated below, the employment actions at issue were not taken under nearly identical circumstances and were not of comparable seriousness.

Moore was responsible for collecting, counting, and depositing "patient cash"—that is, money paid by patients to the various departments at the school of dentistry. According to her own testimony, Moore had been trained to secure those funds in either a locking desk drawer or lock box before leaving her office. Furthermore, UMMC's Cash Policy provides that "cash funds" are to be "stored in a secure location." Stacy, however, was responsible for "petty cash"—money issued by UMMC directly to her by personal check to be used in making change

for patients.  Under UMMC's separate Petty Cash Policy, the custodian of a petty cash fund is responsible for maintaining the fund "at the approved amount at all times" and may "be held responsible for reimbursing UMMC for missing funds."[3]  The Petty Cash Policy recommends that the custodian use some form of "internal controls" to maintain the fund at the approved amount, including, but not limited to, "[s]ignature logs," "[l]imited employee access to [the] safe or locked drawer where funds are kept," or monthly self-audits.  The policy also provides that "departmental personnel"—not just the custodian— should "take the necessary precautions to ensure that the petty cash fund is properly safeguarded," including "ensuring that the fund is not left unattended and is locked up after normal business hours."  Furthermore, according to the testimony of Brookerd and Smith Watson, patient cash is treated differently from petty cash, and it is not a violation of policy to leave petty cash where others can access it.

In sum, Moore directly violated the UMMC Cash Policy and her own training by leaving patient cash unsecured and sitting out on her desk while away from her office.  Stacy, on the other hand, did not directly violate the Petty Cash Policy by leaving her petty cash unsecured.  Furthermore, the drawer in which the cash was kept was locked at the end of each business day, and although Stacy had left early on the last business day before the missing funds were discovered, it was, according to the Petty Cash Policy, the responsibility of all "departmental personnel" to ensure that petty cash funds are "locked up after normal business hours."  Accordingly, and critically, Stacy's conduct, which did not draw an adverse employment action, was not of "comparable seriousness" to Moore's, which did, and their conduct was therefore not "nearly identical."  *Lee*, 574 F.3d at 260–61 (quoting *McDonald*,

---

[3] There is no similar provision for the reimbursement of missing patient cash.

427 U.S. at 283 n.11); *see also id.* at 260 ("[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." (quoting *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004))).  Because "the 'difference between the plaintiff's conduct and that of [the employee] alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).  Accordingly, Moore failed to establish a genuine dispute of material fact as to whether she and Stacy were similarly situated.  As the district court held, Moore therefore failed to establish *prima facie* case of race discrimination, and UMMC was entitled to judgment as a matter of law.

## B.

Moore next contends that the district court erred by dismissing her § 1981 and breach-of-contract claims as barred by the Eleventh Amendment. "We review rulings on motions to dismiss de novo."  *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 320 (5th Cir. 2008).

Moore contends that federal jurisdiction over her § 1981 and breach-of-contract claims is proper because:  (1) Mississippi has waived sovereign immunity for contract-based claims; (2) federal courts have supplemental jurisdiction over state-law claims arising out of the same nucleus of operative fact as federal claims; and (3) Mississippi has waived sovereign immunity to the extent that it has liability insurance.  We find those arguments unavailing and affirm the district court's dismissal.[4]

---

[4] The parties do not dispute that UMMC is an arm of the state and thus entitled to assert sovereign immunity.  *See McGarry v. Univ. of Miss. Med. Ctr.*, 355 F. App'x 853, 856

As to the breach-of-contract claim, Moore is correct that Mississippi has generally waived sovereign immunity to contract-based claims. "The general rule is that when the legislature authorizes the State's entry into a contract, the State necessarily waives its immunity from suit for a breach of contract." *Stewart ex rel. Womack v. City of Jackson*, 804 So. 2d 1041, 1049 (Miss. 2002) (quoting *Gulfside Casino P'ship v. Miss. State Port Auth.*, 757 So. 2d 250, 256 (Miss. 2000)). However, a "general waiver of sovereign immunity . . . does not constitute a waiver by the state of its constitutional immunity under the Eleventh Amendment from suit in federal court." *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981) (quotation marks omitted); *see also Magnolia Venture Capital Corp v. Prudential Sec., Inc.*, 151 F.3d 439, 443 (5th Cir. 1998). Furthermore, "we may find waiver of a state's Eleventh Amendment immunity in only the most exacting circumstances." *Magnolia Venture*, 151 F.3d at 443. A state's consent to suit in federal court must "be unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). While Mississippi has waived its state sovereign immunity to suit in state court for breach of contract, there is no unequivocal statement of its intent to also waive its Eleventh Amendment immunity to suit in federal court. *See Magnolia Venture*, 151 F.3d at 445.

Furthermore, supplemental jurisdiction cannot overcome a state's Eleventh Amendment immunity. As a general matter, of course, a federal court does "have supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But the Supreme Court has refused to "read § 1367(a) to authorize district courts to

---

(5th Cir. 2009) ("The appellee, as an arm of the University of Mississippi, is an agency of the state and entitled to Eleventh Amendment immunity absent waiver or abrogation.").

exercise jurisdiction over claims against nonconsenting States, even though nothing in the statute expressly excludes such claims." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541 (2002). Accordingly, "§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants." *Id.* at 542.

As to the § 1981 claim, that, too, is barred. Section 1981 does not waive a state's Eleventh Amendment immunity. *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. Unit A 1981) ("Unlike Title VII, Section 1981 contains no congressional waiver of the state's [E]leventh [A]mendment immunity.").

Moore's final argument is that dismissal before discovery was premature because she has not yet had the opportunity to discover whether UMMC maintains liability insurance that, she contends, would waive sovereign immunity as to both claims. She relies on a provision of the Mississippi Tort Claims Act ("MTCA"), which provides that "[i]f liability coverage, either through insurance policies or self-insurance retention is in effect, immunity from suit shall be waived only to the limit of liability established by the insurance or self-insurance program." Miss. Code. § 11-46-17(2). But the MTCA does not waive Eleventh Amendment sovereign immunity from suit in federal court.[5] Miss. Code § 11-46-5(4) ("Nothing contained in this chapter shall be construed to waive the immunity of the state from suit in federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 594 (5th Cir. 2006) ("The MTCA also preserves all immunities granted by the Eleventh Amendment of

---

[5] Furthermore, we note that the particular provision of the MTCA on which Moore relies applied only "[b]efore July 1, 1993." Miss. Code § 11-46-17(2). Additionally, the Mississippi Supreme Court has held that the existence of insurance is relevant only to the *amount* of liability, not its existence; in other words, insurance does not itself waive sovereign immunity. *See Maxwell v. Jackson Cty.*, 768 So. 2d 900, 902–03 (Miss. 2000); *Leslie v. City of Biloxi*, 758 So. 2d 430, 434 (Miss. 2000).

No. 17-60348

the United States Constitution."). Accordingly, dismissal of both the § 1981 and breach-of-contract claims was proper.

For the foregoing reasons, we AFFIRM.